The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KENNETH WRIGHT, on his own behalf and on behalf of other similarly situated persons,<br><br>                                    Plaintiff,<br><br>        v.<br><br>LYFT, INC., a Delaware corporation,<br><br>                                    Defendant. | NO. 2:14-cv-00421MJP<br><br>DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR STAY<br><br>NOTE ON MOTION CALENDAR:<br>JULY 18, 2014<br><br>ORAL ARGUMENT REQUESTED |

## I. **INTRODUCTION**

Plaintiff Kenneth Wright alleges that on March 20, 2014, he received a mobile phone text message that "Jo Ann C." was inviting him to download Defendant Lyft, Inc.'s ("Lyft") free mobile phone application.  Four days later, based on his receipt of this single allegedly "unsolicited" text, Wright filed this putative class action[1] asserting Lyft violated: (i) the federal Telephone Consumer Protection Act ("TCPA") (47 U.S.C. § 227); (ii) Washington's Commercial Electronic Mail Act ("CEMA") (RCW 19.190, *et seq.*); and (iii) Washington's Consumer Protection Act ("CPA") (RCW 19.86, *et seq.*).  The Complaint fails to state a claim under any of these three statutes and should be dismissed.

---

[1] This action was initially filed on March 24, 2014 (ECF No. 1).  After Lyft responded by filing an earlier Motion to Dismiss or Stay (ECF No. 8), Wright filed a First Amended Complaint (ECF No. 14).

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR STAY (NO. 2:14-cv-00421MJP) - 1

BYRNES ♦ KELLER ♦ CROMWELL LLP<br>38TH FLOOR<br>1000 SECOND AVENUE<br>SEATTLE, WASHINGTON  98104<br>(206) 622-2000

First, Wright fails to state a TCPA claim because he does not allege facts plausibly showing Lyft used an "automatic telephone dialing system" ("ATDS") to send the text message, as required by the express terms of the statute.  47 U.S.C. § 227(b)(1)(A).  Indeed, rather than allege Lyft sent the text "using a random or sequential number generator," which is what an ATDS is statutorily defined as, the First Amended Complaint ("Amended Complaint") alleges that Wright's contact, "Jo Ann C.," agreed to and initiated a manual, multi-step, user-based process to send the text message, which Lyft then sent through its computer system.  Wright's failure to plausibly allege facts showing Lyft used an ATDS is fatal to the TCPA claim.

Next, Wright fails to state a Washington CEMA claim for three separate reasons.  First, CEMA does not provide Wright with an independent private cause of action for damages, as he has not alleged what the statute requires – that the text included a "phishing" type of misrepresentation seeking to induce him to provide "personally identifying information."  RCW 19.190.090(1), 19.190.080.  Second, the text allegedly sent to Wright is not a "commercial" text message under RCW 19.190.010.  Third, he does not allege the text message caused him any actual damage that is compensable under CEMA.  RCW 19.190.090(1).

Finally, Wright fails to state a claim under Washington's CPA.  To the extent that Wright's CPA claim is derivative of his failed CEMA claim, the CPA claim also fails.  Also, even if Wright's CPA claim is independent of his CEMA claim, it fails because he did not allege any cognizable injury to business or property as required under the CPA.

Accordingly, under Rule 12(b)(6), Lyft moves to dismiss all of the claims asserted in the Amended Complaint.  In the alternative, however, Lyft requests a stay under the doctrine of primary jurisdiction.  Congress charged the Federal Communications Commission ("FCC") with administration of the TCPA.  *See, e.g.,* 47 U.S.C. § 227(b)(2).  Lyft contends in this motion that the TCPA is clear, and that under the plain language of the statutory definition of an ATDS, the Amended Complaint fails to plausibly allege that an ATDS was used.  The FCC has not previously addressed whether a mobile phone application that allows one user to "invite" their

friends to download the same application by sending a text message through the application might constitute an ATDS.  However, as a result of the recent "juggernaut"[2] of TCPA class actions, there are now at least two petitions pending in front of the FCC seeking declaratory relief that a mobile phone application's "invitational" texts are not sent via an ATDS and thus are not barred by the TCPA.  If the Court does not dismiss the Amended Complaint, further proceedings should be stayed until the FCC decides these related petitions because of the FCC's expertise in this technical area of rapidly-expanding technology and to promote uniformity regarding these issues.

## II.  BACKGROUND

Lyft created a mobile phone application that facilitates an "on-demand peer-to-peer ridesharing" network.  ECF No. 14, First Amended Complaint ("Am. Compl.") ¶ 10.  A person who wants a ride can use Lyft's application to find nearby drivers who are willing to provide it.  *Id.* ¶ 11.

Lyft's application includes a feature called "Invite Friends," with which a user may invite his or her friends to download Lyft's mobile phone application.  *Id.* ¶ 16.  These invitations are sent by text message.  *Id.*  Wright alleges that he received an "unsolicited" text message on his mobile phone reading:

> Jo Ann C. sent you a free Lyft ride worth $25.  Claim it at
> http://lyft.com/getapp/MD15M215.

*Id.* ¶ 18.

Text messages like the one Wright received are initiated by current Lyft users, not by Lyft.  *Id.* ¶ 16.  Sending such a text message requires a Lyft user such as Wright's contact, Jo Ann C., to take multiple, independent, manual steps.  First, a user must open the Lyft application on her mobile phone.  *See generally id.* at ¶¶ 11, 16.  The user then must locate and open the settings menu in the application.  Next, the user must manually open the "Invite Friends"

---

[2] *See* http://www.instituteforlegalreform.com/resource/the-juggernaut-of-tcpa-litigation--the-problems-with-uncapped-statutory-damages/ (last visited June 25, 2014).

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR
STAY (NO. 2:14-cv-00421MJP) - 3

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

function within the Lyft application.  *Id.* ¶ 16.  The application then displays a list of the user's contacts, which are stored within the user's mobile phone.  *Id.*  From her contact list, a user then manually selects the individual or individuals to whom she wishes to send an "invitation" to download Lyft's application, or the user may "Select All" her contacts.  *Id.*  After making such a selection, the user manually presses "Send Invites" within the application.  Only then, at the end of this several-step process, is an invitational text message sent.  Wright alleges that the text is sent through Lyft's computer system to the recipient.  *Id.*  Wright also claims that his receipt of this "invitation" caused him injury and unspecified actual damage.  *Id.* ¶ 21.

### III. <u>ARGUMENT</u>

Rule 12 weeds out implausible claims before parties engage in expensive litigation.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  Under Rule 12(b)(6), a complaint may be dismissed if it fails to state a claim upon which relief may be granted.  Fed. R. Civ. P. 12(b)(6).  The plaintiff must assert more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action."  *Bell Atl. Corp.*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action" are insufficient to state a claim.).

Here, Wright's allegations fail to state claims under the federal and state statutes he tries to invoke.  Accordingly, the Amended Complaint should be dismissed in its entirety.  In the alternative, if the Court concludes Wright may have sufficiently stated a TCPA claim, then this case should be stayed under the doctrine of primary jurisdiction pending the FCC's rulings on petitions currently pending in front of that agency seeking declaratory relief that an "invitational" text message sent by the user of a mobile phone application does not violate the TCPA.

### A. <u>Wright Fails to State a TCPA Claim</u>

First, the Amended Complaint fails to state a claim under the TCPA because it does not plausibly allege Lyft used an ATDS to send text messages nor does it plausibly allege Lyft "makes" the calls.

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR STAY (NO. 2:14-cv-00421MJP) - 4

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington  98104
(206) 622-2000

1

2     **1.      TCPA Claims Must Allege Use of an ATDS**

3          The elements of Wright's TCPA claim are:  "(1) the defendant called a cellular telephone

4     number; (2) using an automatic telephone dialing system; (3) without the recipient's prior

5     express consent."  *Gragg v. Orange Cab Co.*, __ F. Supp. 2d __, No. C12-0576 RSL, 2014 WL

6     494862, at *2 (W.D. Wash. Feb. 7, 2014) *reconsideration denied*, 2014 WL 801305 (W.D.

7     Wash. Feb. 28, 2014).  A text message is interpreted as a "call" under the TCPA.  *Satterfield v.*

8     *Simon & Schuster, Inc.*, 569 F.3d 946, 949 (9th Cir. 2009).  Thus, Wright cannot state a TCPA

9     claim unless he alleges a call was made using an ATDS.

10         The TCPA, in turn, defines an ATDS as:

11                equipment which has the capacity –
                      (A) to store or produce telephone numbers to be called, using a
12                    random or sequential number generator; and
                      (B) to dial such numbers.

13    47 U.S.C. § 227(a)(1).  Given the plain language of the statute, for Lyft's system to constitute an

14    ATDS, it must have "the capacity to 'store, produce, or call randomly or sequentially generated

15    telephone numbers.'"  *Gragg*, 2014 WL 494862, at *3 (quoting *Satterfield*, 569 F.3d at 951).

16         Alternatively, given certain FCC rulings, some courts, including this Court, have ruled

17    that a defendant's equipment is an ATDS if it functions as a "predictive dialer."  For example, in

18    *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1129 (W.D. Wash. 2012), this Court concluded

19    that a "predictive dialer is considered an ATDS under the TCPA."  *Id.* at 1129 (citing *In re Rules*

20    *& Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C.R. 14014, 14093

21    (2003)); *see also, e.g., Gragg*, 2014 WL 494862, at *2 (equipment is an ATDS if it "is a

22    predictive dialer with the capacity to dial telephone numbers from a list without human

23    intervention").

24

25

26

## 2.  **Wright's ATDS Allegations**

Wright alleges neither "type" of ATDS.  Instead, Wright alleges in conclusory fashion, without alleging any *facts*, that Lyft's application is a system that "operates as an automatic telephone dialing system."  Am. Compl. ¶ 17.  Moreover, Lyft's system is alleged to have the "ability to dial numerous cellular telephone numbers and to transmit numerous text messages to large lists of stored cellular telephone number[s] [*sic*] without any human involvement."  *Id.* ¶ 13.

However, Wright's allegations show that the alleged ATDS system is not initiated unless an individual user, such as "Jo Ann C.," initiates it, and then manually completes a multi-step process that, as to each step, requires human intervention.  *See id.* ¶ 16.  Apparently recognizing defects in his initial Complaint, Wright's Amended Complaint tries to minimize the manual process a *user* must initiate to send the invitational text messages.  However, because Wright incorporates by reference and relies on the "Invite Friends" feature of the Lyft application, Lyft refers to all parts of that feature.  *Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005).

Specifically, the "Invite Friends" function operates as follows:

(1)  The user must manually open the Lyft application on her mobile phone.



(2)  Next, the user must manually locate and open the settings menu in the application.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

(3)     From that menu, the user must manually select the "Invite Friends" function

within the application.  Am. Compl. ¶ 16.



(4)     The "Invite Friends" function displays the user's phone contact list.  From that

display, the user then must manually select the individual(s) from her contact list

to whom to send the invitational text, or the user may manually select all of her

contacts at once.  *Id.*

 

(5)     The user then must confirm her intent to send the invitational text message by

manually pressing "Send Invites."



DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR
STAY (NO. 2:14-cv-00421MJP) - 7

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

Decl. of C. Mam filed herewith ("Mam Decl.") ¶ 2 (The Court may consider these screen shots without converting this motion to summary judgment because the Amended Complaint, at ¶¶ 11, 13, 16, incorporates by reference the "Invite Friends" function shown by the images.  *Keithly v. Intelius, Inc.*, 764 F. Supp. 2d 1257, 1261-62 (W.D. Wash. 2011)).  Only after a user presses "Send Invites," does Lyft's computer system process the data received from the user and send the invitational text message.  Am. Compl. ¶ 16.

3.      **Wright Has Not Alleged Use of a Random or Sequential Number Generator**

Accordingly, the Amended Complaint's allegations do not support an inference that Lyft's system has the capacity to dial calls "using a random or sequential number generator." Indeed, to the contrary, the Amended Complaint alleges that Lyft's users, such as "Jo Ann C.," deliberately select specific people with particular phone numbers from among the user's own list of contacts on their own mobile phones, and agree to initiate text messages that are then sent through Lyft's computers.  Am. Compl. ¶ 16.

Moreover, Wright's conclusory allegation that Lyft's computer system "sequentially generate[s]" (¶ 16) and "automatically transmit[s]" (¶ 13) the text messages is insufficient. *Iqbal*, 556 U.S. at 678.  Although the statute does not define "random or sequential number generator," these terms are properly understood by their ordinary meaning: "'Random number generation' means random sequences of 10 digits, and 'sequential number generation' means (for example) (111) 111-1111, (111) 111-1112, and so on."  *Gragg*, 2014 WL 494862, at *3. Here, then, the use of conclusory allegations is insufficient to support a claim that Lyft used a "random or sequential number generator" to fire off random text messages.  47 U.S.C. § 227(a)(1).

Accordingly, Wright's TCPA claim fails and should be dismissed.  *See Dominguez v. Yahoo!, Inc.*, __ F. Supp. 2d __, No. 13-1887, 2014 WL 1096051 (E.D. Pa. Mar. 20, 2014) (granting summary judgment because the facts did not support that defendant uses a "random or sequential" number generator to send the text messages); *Iqbal*, 556 U.S. at 678.

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR
STAY (NO. 2:14-cv-00421MJP) - 8

### 4.  Wright Has Not Alleged Use of a "Predictive Dialer"

In addition, the Amended Complaint does not allege Lyft's system constitutes a "predictive dialer" type of ATDS.  Additional background on "predictive dialers" makes this clear.  In 2003, the FCC addressed whether a "predictive dialer" used by telemarketers was an ATDS.  The FCC explained that a predictive dialer is:

> an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call.  Such software programs are set up in order to minimize the amount of downtime for a telemarketer.

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 F.C.C.R. at 14143 n.31 (2003).

The FCC also explained the problems caused by predictive dialers:

> Predictive dialers initiate phone calls while telemarketers are talking to other consumers and frequently disconnect those calls when a telemarketer is unavailable to take the next call.  In attempting to "predict" the average time it takes for a consumer to answer the phone and when a telemarketer will be free to take the next call, predictive dialers may either "hang-up" on consumers or keep the consumer on hold until connecting the call to a sales representative, resulting in what has been referred to as "dead air."

*Id.* at 14101-02.  Thus, "[u]sing predictive dialers allows telemarketers to devote more time to selling products and services rather than dialing phone numbers, but the practice inconveniences and aggravates consumers who are hung up on."  *Id.* at 14022.

Among other things, the FCC addressed whether a predictive dialer fits the statutory definition of an ATDS because many predictive dialers did not use random or sequential number generators.  Instead, "in most cases, telemarketers program the numbers to be called into the equipment, and the dialer calls them at a rate to ensure that when a consumer answers the phone, a sales person is available to take the call."  *Id.* at 14091.  The FCC explained that "[t]he principal feature of predictive dialing software is a timing function, not number storage or generation."  *Id.*  Ultimately, appearing to abandon the statutory language defining an ATDS as "using a random or sequential number generator" so long as the equipment had the "timing function" of a predictive dialer, the FCC found that "a predictive dialer falls within the meaning

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR
STAY (NO. 2:14-cv-00421MJP) - 9

and statutory definition of 'automatic telephone dialing equipment' and the intent of Congress."
*Id*. at 14093.

Here, however, there is no allegation that Lyft's equipment is "predicting" when sales agents are available to take calls and sending text messages at those times.  Nor is there any allegation that Lyft's system is making a timing "prediction" of any kind.  Accordingly, Wright has not alleged use of the "predictive dialer" variety of an ATDS, and Wright's TCPA claim fails.

**5.**      **There Is No Basis for Applying the FCC's Predictive Dialer Language to Equipment That Is Not a Predictive Dialer**

Additionally, there is no basis for applying the FCC's rulings regarding "predictive dialers" to equipment that has no "predictive" timing function.  Some courts, including this Court, have taken the FCC's 2003 and a subsequent 2008 ruling[3] regarding "predictive dialers" to mean that, so long as a defendant's equipment is capable of making calls from a list or database of numbers "without human intervention," then the equipment is a "predictive dialer" type of ATDS – irrespective of whether the equipment is used to make "predictive" calls.  Thus, for example, in *Voxernet*, this Court ruled that a plaintiff's allegations concerning receipt of an invitational text message from a mobile phone application alleged defendant's use of an ATDS, as follows:

> A predictive dialer is considered an ATDS under the TCPA.  *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act. of 1991*, 18 F.C.C.R. 14014, 14093 (2003). "A predictive dialer is . . . hardware, when paired with certain software, [which] has the capacity to store or produce numbers and dial those numbers . . . from a database of numbers."  *Id.* at 14091.  The FCC states that "the basic function of such equipment . . . [is] the capacity to dial numbers without human intervention."  *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 23 F.C.C.R. 559, 566 (2008).

*Hickey v. Voxernet LLC*, 887 F. Supp. 2d at 1129.

---

[3] *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C.R. 559, 566 (Jan. 4, 2008).

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR
STAY (NO. 2:14-cv-00421MJP) - 10

However, there is no basis for applying the FCC's declaratory rulings regarding "predictive dialers" to equipment that is *not* alleged to be a "predictive dialer."  To do so would sanction a wholesale rewriting of Congress' statutory definition of an ATDS, which only Congress can do.  *See La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 376 (1986) ("As we so often admonish, only Congress can rewrite [a] statute.").  No longer would ATDS equipment be defined as having the capacity "to store or produce telephone numbers to be called, using a random or sequential number generator."  47 U.S.C. § 227(a)(1).  Instead, if the FCC's 2003 and 2008 rulings are applied to equipment that does not have a predictive "timing feature," then the statutory definition is rewritten to "any equipment having the capacity to dial numbers without human intervention."  To the extent Wright seeks to invoke such an argument here, it fails for two reasons.

First, if the FCC's declaratory rulings are read to approve such a wholesale rewriting of the statute, those rulings are unreasonable and not entitled to judicial deference.  The two-step *Chevron* analysis determines whether a court should give an agency's interpretation of a statute deference.  *Satterfield*, 569 F.3d at 952 (citing *Chevron, USA, Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837 (1984)).  Under *Chevron*, the court must first determine whether the intent of Congress is clear and give effect to the unambiguously expressed intent of Congress.  Second, if the statute is silent or ambiguous, the court is to defer to the agency's permissible construction of the statute.  *Id.*; *Meilleur v. AT&T Inc.*, No. C11-1025 MJP, 2011 WL 5592647 (W.D. Wash. Nov. 16, 2011).  Here, because the language of the statute is clear, and the statute plainly defines ATDS equipment as having the capacity "to store or produce telephone numbers to be called, using a random or sequential number generator," there is no need for courts to look beyond the plain language of the TCPA to the FCC's declaratory rulings regarding "predictive dialers."

Moreover, even if the FCC's declaratory rulings have, in effect, accomplished a wholesale rewriting of the definition of an ATDS to mean "equipment having the capacity to dial telephone numbers from a list without human intervention," and even if the Court were to apply

that definition, Wright **still** fails to state a TCPA claim.  Here, the Amended Complaint does not

allege that the process required for sending the text messages is "without human intervention."

Instead, a user must agree to and engage in a manual process, involving multiple steps, before a

text message is sent.  For this reason, too, the TCPA claim fails and must be dismissed.  *See*

*Gragg*, 2014 WL 494862, at \*3 (granting summary judgment that defendant was not using an

ATDS because taxi drivers had to manually press a button before the text message was sent).

### 6.   Lyft Is Merely a Conduit for Sending the Text Message

Finally, Wright's allegations do not support a TCPA claim because the logical inference

is that the user initiates the calls, and Lyft is merely a conduit for the user's interaction with her

contacts.  The TCPA holds only those who "make" calls using an ATDS liable.  47 U.S.C. §

227(b)(1).  Wright alleges that Lyft sends the text messages, not individual users, based on the

fact that the originating area code from which the text message was sent is a San Francisco area

code (*i.e.,* where Lyft is headquartered).  Am. Compl. ¶ 19.  However, this allegation is

inconclusive regarding whether Lyft merely acts as a conduit of the text message initiated by "Jo

Ann C."  In fact, Wright's own allegations contradict his conclusion that users do not "make" the

calls here.  *See Twombly*, 550 U.S. at 555.

The Amended Complaint discusses the user-driven process to initiate the text messages:

(1) the *user* opens the Lyft application; (2) the *user* locates and opens the settings within the

application; (3) from the settings menu, the *user* selects "Invite Friends"; (4) the *user* selects

which of her contacts, or all of them, should receive an invitational text message; and (5) the

*user* then confirms her selections by pressing "Send Invites."  *See* Am. Compl. ¶ 16.  It is not

until the *user* makes each of these decisions and ultimately confirms those decisions that the

*user's* choices are transmitted to Lyft's computer system for forwarding as directed by the *user*.

*Id.*  The factual allegations and "Invite Friends" functionality itself show a peer-to-peer

communication of information that is merely facilitated by Lyft.

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR
STAY (NO. 2:14-cv-00421MJP) - 12

1   Accordingly, the Amended Complaint does not support the legal conclusion that Lyft

2   "makes" the calls.

3   **B.     Wright Fails to Allege a Claim Under CEMA**

4       Next, Wright fails to state a CEMA claim for three independent reasons:  (1) CEMA does

5   not provide Wright a private right of action under these circumstances; (2) the text message is

6   not commercial; and (3) the Amended Complaint does not allege actual damage.

7       **1.     CEMA Does Not Provide Wright a Private Right of Action**

8       The CEMA claim fails because CEMA simply does not provide a private right of action

9   for damages under the alleged facts.  RCW 19.190.090(1) expressly limits private causes of

10  action for damages under CEMA to claims for violating CEMA's "anti-phishing" provision,

11  RCW 19.190.080.  Specifically, RCW 19.190.090(1) provides:  "A person who seeks damages

12  under this subsection may only bring an action against a person or entity that directly violates

13  RCW 19.190.080."

14      However, Wright does not assert a violation of RCW 19.190.080, which bars "tak[ing]

15  any action to induce a person to provide personally identifying information" by misrepresenting

16  oneself "to be another person, without the authority or approval of such other person."  RCW

17  19.190.080.  Although Wright vaguely claims that the text message invites are deceptive because

18  a consumer would have to provide some unspecified "other consideration" to use the Lyft

19  application, such an allegation does not implicate the "phishing" tactics the statute prohibits.

20  Am. Compl. ¶ 24.  Instead, Wright would need to, but does not, allege that the text message he

21  received was some sort of subterfuge or misrepresentation by which he was tricked into

22  revealing, for example, his credit card information.  Thus, because he does not allege Lyft

23  violated RCW 19.190.080 (for which .090(1) does create a private remedy), and because CEMA

24  does not provide a private cause of action for damages for other violations, Wright's CEMA

25  claim fails.  RCW 19.190.090(1).

26

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington  98104
(206) 622-2000

2. **The Text Message Here Is Not "Commercial"**

The CEMA claim also fails because the text message is not commercial in nature. CEMA prohibits sending "commercial" text messages to mobile phones. RCW 19.190.060; *Voxernet LLC*, 887 F. Supp. 2d at 1132. Specifically, the statute reads, in pertinent part:

> (1) No person conducting business in the state may initiate or assist in the transmission of an electronic commercial text message to a telephone number assigned to a Washington resident for cellular telephone or pager service that is equipped with short message capability or any similar capability allowing the transmission of text messages.

RCW 19.190.060(1).

The statute defines "commercial electronic text message" as a message "sent to promote real property, goods, or services **for sale or lease**." RCW 19.190.010(3) (emphasis added). In conclusory fashion, the Amended Complaint asserts that the text message was "commercial" and promotes "the sale of Defendant's services through the Lyft app." *See* Am. Compl. ¶¶ 2, 17, 24. Conclusory allegations are not entitled to an assumption of truth and are plainly insufficient to state a claim for relief. *Iqbal*, 556 U.S. at 678, 680.

Instead, to state a claim under CEMA, Wright must plead *facts* showing that the text message was "commercial," *i.e.*, that the text message promoted a sale. Under facts substantially similar to those alleged here, this Court previously held that an invitation to download a free application does not meet the statutory definition of "commercial." *Voxernet*, 887 F. Supp. 2d at 1132. In *Voxernet*, the defendant sent text messages from a subscriber's contact list to non-subscribers. *Id.* at 1128. The text message read "Get on Voxer" followed by the link to download the application. *Id.* The plaintiff had not, and could not have, alleged that he had to pay for the **free** phone application. *Id.* at 1132. Other courts have found that software updates, which are free to the consumer, are not sales. *Id.* (citing *Wofford v. Apple Inc.*, No. 11-CV-0034 AJB NLS, 2011 WL 5445054, at *2 (S.D. Cal. Nov. 9, 2011)). Given the ordinary meaning of

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR STAY (NO. 2:14-cv-00421MJP) - 14

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

"sale," and the lack of any allegation of payment for the download, this Court concluded the text was not "commercial," and therefore dismissed plaintiff's CEMA claim. *Id.*

Here, Wright alleges facts quite similar to those in *Voxernet*. Wright received a text message from "Jo Ann C." that offered him a free $25 Lyft ride, and included a link inviting him to download the free Lyft mobile phone application. Am. Compl. ¶ 18. The Amended Complaint vaguely alleges that a consumer receiving this text must provide some unspecified consideration to use the Lyft application. *Id.* ¶ 24. However, there is no allegation that the consumer must pay some price to download the free application. *Voxernet*, 887 F. Supp. 2d at 1132 (a sale includes "a price in money paid or promised" (quoting Black's Law Dictionary (9th ed. 2009))).

Nor could Wright allege that the text promoted a "sale" of the Lyft mobile phone application. The link in the text message leads to this information:



The screen shot confirms that the application is **free** to download. Mam Decl. ¶ 3 (The Court may consider this screen shot without converting this motion to summary judgment because the Amended Complaint, at ¶ 18, incorporates by reference the link to download. *See Keithly v. Intelius, Inc.*, 764 F. Supp. 2d at 1261-62). There is no requirement for an exchange of money or any other "sale" to get the application Wright was invited to download, or even to get the $25 free ride. Accordingly, the factual allegations do not show that the text was sent to promote a

1   "sale or lease." Thus, the text message was not "commercial" for purposes of a CEMA claim,

2   and Wright's CEMA claim must be dismissed.

3

4   **3.   Wright Failed to Allege Actual Damage Due to the Receipt of the Text Message**

5        Finally, the CEMA claim fails for another, independent, reason:  Wright has not alleged

6   any actual damage caused by his receipt of the text.

7        Under CEMA, only a "person **who is injured** under this chapter may bring a civil

8   action." RCW 19.190.090(1) (emphasis added).  The statute should be interpreted by applying

9   its plain meaning.  *Bank of Am., N.A. v. Owens*, 266 P.3d 211, 217 (Wash. 2011).  Under the

10  statute, "who is injured" modifies "person."  Accordingly, only a person "who is injured" has

11  standing to bring a CEMA action.  RCW 19.190.090(1).  "Injure" is defined as "to inflict

12  material damage or loss on." Merriam Webster's Collegiate Dictionary 602 (10th ed. 1993).

13  Thus, to have standing, Wright must actually have been damaged by the text message.

14       Washington courts have construed similar statutory provisions as requiring a showing of

15  actual damage.  *State, Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 43 P.3d 4, 10 (Wash.

16  2002) (courts may look to a related statute to determine the intent of a statute).  For example,

17  under the CPA, which allows "any person **who is injured**" in their business or property to bring

18  a civil action, the courts require plaintiffs to show actual injury to business or property.

19  *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 532 (Wash. 1986)

20  (emphasis added).

21       Here, Wright alleges no facts of actual cognizable damage from receipt of the single text

22  message.  For example, Wright does not allege that he incurred any *additional* charges for

23  receiving the text message.  Instead, the Amended Complaint alleges only that Wright had to pay

24  for his mobile phone service, not that the text message caused any increase in his bill.  Am.

25  Compl. ¶ 27.  That is not *actual* damage caused by receipt of the text message.  And, Wright's

26

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

other allegations of injury, such as invasion of privacy and annoyance, also do not allege any actual damages.  Am. Compl. ¶ 27.

Moreover, the Amended Complaint contends that by transmitting "thousands" of text messages every day, Lyft has "burdened or injured the telecommunications infrastructure," such that "cellular service providers incurred avoidable costs which negatively impact the price that consumers," like Wright, "must pay for cellular telephone services."  Am. Compl. ¶ 21.  However, generalized and unsupported allegations about text messages' theoretical, indirect, and remote effects on the prices consumers ultimately pay fail to allege a cognizable injury to Wright.  *Iqbal*, 556 U.S. at 678 ("naked assertions" of fact are insufficient to state a claim).

CEMA requires more than a request for statutory damages.  Instead, Wright must show the alleged CEMA violation actually caused him to sustain some damage, *i.e.*, that he was "injured."  RCW 19.190.090(1).  Wright's failure to allege such damages requires dismissal of his CEMA claim.

**C.   Wright Fails to Allege a Claim Under the CPA**

Finally, Wright's CPA claim should be dismissed because (1) the CPA claim is derivative of Wright's failed CEMA claim, thus also fails, and (2) Wright has not alleged a cognizable injury under the CPA.

The elements of a claim under the CPA are:  "(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation."  *Hangman Ridge*, 719 P.2d at 533.  A person "who is injured in his or her business or property" is granted a private right of action for the violation.  RCW 19.86.090.

Wright asserts that a CEMA violation is a *per se* violation of the CPA.  Am. Compl. ¶ 54.  However, unlike certain other statutes, CEMA does not establish the elements of injury or causation (*see* RCW 19.190.060(2)).  Thus, CEMA does not provide for a *per se* violation of the

CPA, which requires both elements be met.  *Gragg v. Orange Cab Co.*, 942 F. Supp. 2d 1111, 1117 (W.D. Wash. 2013).

### 1.    <u>Wright's Derivative CPA Claim Fails Because the Underlying CEMA Claim Fails</u>

Wright's CPA claim relies on finding Lyft liable under CEMA.  Because Wright does not, and cannot, state a CEMA claim, as discussed above, his derivative CPA claim also fails. *See Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1065 (9th Cir. 2009) ("Because [the plaintiff's] CEMA claims fail as a matter of law, his CPA claims, to the extent grounded in CEMA violations, are likewise inadequate and were properly dismissed.").

### 2.    <u>Wright Fails to Allege Injury to Business or Property</u>

Furthermore, even if Wright intended the CPA claim to be independent of the CEMA claim, it fails because Wright has not alleged a cognizable injury under the statute.

A plaintiff must show injury to business or property under the CPA.  *Hangman Ridge*, 719 P.2d at 535; RCW 19.86.090.  Personal injuries do not suffice:

> Personal injuries, as opposed to injuries to "business or property," . . . do not satisfy the injury requirement.  Thus, damages for mental distress, embarrassment, and inconvenience are not recoverable under the CPA.  However, the injury requirement is met upon proof the plaintiff's property or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal.

*Gragg*, 942 F. Supp. 2d at 1118 (quoting *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 57, 204 P.3d 885 (2009)).

Here, the alleged injuries fail to state a cognizable injury or causation required under the CPA, as was the case in *Gragg*.  In *Gragg*, the plaintiff had alleged the following injuries arising from an "unsolicited" text message:  (1) paying for cell phone service (not above plaintiff's normal bill); (2) invasion of privacy; (3) aggravation and annoyance; (4) loss of full mobile phone capacity because of use of electronic storage space; and (5) general burdens on the entire

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR STAY (NO. 2:14-cv-00421MJP) - 18

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

cellular network.  *Id.* at 1118-19.  Each of these alleged injuries were held by Judge Lasnik to be either a "personal" injury not cognizable under the CPA or too speculative to state a claim.  *Id.*

Wright's alleged "injuries" here fail for the same reasons.  First, the Amended Complaint alleges that Wright was injured by "[h]aving to pay a cellular service provider to receive the unsolicited text message."  Am. Compl. ¶ 27.  This allegation fails to plead any actual damages or injury to Wright.  In fact, Wright carefully pleads that he paid for his mobile phone services generally, but not that he paid anything more because of his having received the Lyft text message.  This allegation does not state a cognizable CPA injury.  *Gragg*, 942 F. Supp. 2d at 1118.

Second, Wright alleges that the text message invaded his privacy.  Am. Compl.  ¶ 27.  That alleged injury is a "personal injury" that is not cognizable under the CPA.  *Gragg*, 942 F. Supp. 2d at 1118-19.

Next, Wright alleges the text message was an "[a]ggravation and annoyance."  Am. Compl. ¶ 27.  Again, that is an alleged "personal injury" rather than an injury to "business or property," and it is not cognizable under the CPA.  *Gragg*, 942 F. Supp. 2d at 1119.

Additionally, Wright alleges that the text message caused "[l]oss of use of the full capacities and capabilities" of his phone, such as electronic storage space and battery energy.  Am. Compl. ¶ 27.  However, this allegation is not supported by any facts showing that the text message actually interfered with his use of the mobile phone or its capabilities, *i.e.*, that he ran out of storage space.  And, although a temporary loss of use of property may constitute injury, the loss of use of a rechargeable battery or temporary loss of storage space due to a single text message that is gone when deleted is such an "infinitesimal, fleeting loss" that it can only be described as a mere "uncompensable inconvenience."  *Gragg*, 942 F. Supp. 2d at 1119.  Those alleged injuries do not constitute cognizable injury to business or property.  *Id.*

Finally, the Amended Complaint alleges that Lyft's text messages "burdened or injured the telecommunications infrastructure" and that "cellular service providers incurred avoidable

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

costs which negatively impact the price that consumers like Plaintiffs must pay for cellular telephone services."  Am. Compl. ¶ 21.  Accordingly, Wright alleges that he was injured because the cellular network he relies on was impaired or burdened.  *Id.* ¶ 27.  As in *Gragg*, however, this fails because it is "far beyond speculative" that the text messages burdened the network in such a way that would cause Wright any pecuniary injury.  *Gragg*, 942 F. Supp. 2d at 1119.

The CPA claim fails and should be dismissed.

**D.     In the Alternative, This Court Should Stay the Case Under the Doctrine of Primary Jurisdiction**

Lyft believes Wright's Amended Complaint should be dismissed in its entirety.  In the alternative, Lyft seeks a stay of the proceedings under the doctrine of primary jurisdiction, pending the FCC's resolution of two pending petitions regarding whether similar mobile phone application "invitational" text messages are barred by the TCPA.

Under the Ninth Circuit's primary jurisdiction test, courts may stay a case pending an agency determination "where there is '(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration.'"  *Davel Commc'ns, Inc. v. Qwest Corp.*, 460 F.3d 1075, 1086-87 (9th Cir. 2006) (quoting *United States v. Gen. Dynamics*, 828 F.2d 1356, 1362 (9th Cir. 1987)).  Courts invoke the primary jurisdiction doctrine "to advance regulatory uniformity," "to answer a 'question . . . within the agency's discretion,'" and "to benefit from 'technical or policy considerations within the agency's . . . expertise.'" *Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 466 (6th Cir. 2010).

Recently, given the rapid expansion of TCPA class action suits and the related increase in petitions for declaratory relief in front of the FCC, several district courts have entered stays of TCPA litigation under the primary jurisdiction doctrine.  *See, e.g., Hurrle v. Real Time Resolutions, Inc.*, No. C13-5765 BHS, 2014 WL 670639 (W.D. Wash. Feb. 20, 2014); *Mendoza*

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR
STAY (NO. 2:14-cv-00421MJP) - 20

*v. UnitedHealth Group Inc.*, No. 13-1553 PJH, 2014 WL 722031 (N.D. Cal. Jan. 6, 2014); *Fried v. Sensia Salon, Inc.*, No. 4:13-cv-00312, 2013 WL 6195483 (S.D. Tex. Nov. 27, 2013).  For the same reasons, if the Court does not dismiss the TCPA claim, such a stay should be entered here.

### 1.   The FCC Needs to Address Whether Invitational Text Messages Sent by Mobile Phone Application Users Are Sent by an ATDS

Lyft contends that the TCPA's definition of an "automatic telephone dialing system" is clear and plainly does not encompass text messages sent by mobile phone applications. However, if the Court disagrees, this issue will turn on an unanswered question about the statute's applicability to a mobile phone application's "invitational" text messages.  The FCC has not previously addressed this question, but there are at least two pending petitions before the FCC that ask for declaratory relief on this issue.  Specifically, Glide Talk, Ltd., and TextMe, Inc., have filed for declaratory relief regarding whether "invitational texts" sent from mobile phone applications constitute use of a prohibited ATDS.

### a.   Glide Talk's Petition

First, on October 28, 2013, after Glide Talk was sued under the TCPA and obtained a stay, it petitioned the FCC for expedited declaratory relief.  Mam Decl., Ex. 1.  Glide Talk provides a video messaging service application, Glide App, used on mobile devices.  *Id.* at 6.  It also offers its users the ability to invite, via text message, others to install Glide App.  *Id.* at 7. As with Lyft's application, Glide Talk users choose the recipients of these text messages from their own contact lists.  *Id.*

Through its petition, Glide Talk seeks declaratory relief including that (i) the TCPA's restrictions on the use of an ATDS to call wireless numbers does not apply to invitational texts sent by a mobile application, as the equipment does not have the capacity to dial random or sequential numbers, and (ii) in the alternative, text messages sent by the application's users are not initiated by Glide Talk and it should not be deemed the responsible party for violations of the TCPA.  *Id.* at 9.

1   The FCC sought comments regarding Glide Talk's petition, and the comment period

2   closed on January 21, 2014. *Consumer & Governmental Affairs Bureau Seeks Comment on*

3   *Petition for Expedited Declaratory Ruling Filed by Glide Talk, Ltd.*, 2013 WL 6248565, 28

4   F.C.C.R. 16336 (FCC Dec. 2, 2013).

5                    **b.      TextMe's Petition**

6   Next, on March 18, 2014, after being sued on TCPA claims and obtaining a stay, TextMe

7   filed a petition for declaratory relief.  Mam Decl., Ex. 2.  According to its petition, TextMe

8   provides a free mobile telephone application ("TextMe App") that enables users to send and

9   receive text messages and voice calls. *Id.* at 4.  As does Lyft, TextMe's application has a

10  function allowing users to invite friends to use the application by sending an invitational text

11  message. *Id.*

12  In its petition, TextMe seeks declaratory relief including (i) clarification that the term

13  "capacity" used in the TCPA's definition of "automatic telephone dialing system" is limited to

14  the equipment's actual capacity to send messages to randomly or sequentially dialed numbers at

15  the time the challenged calls were made, not to whether the equipment could have the capacity if

16  programmed later (thus excluding TextMe invitational text messages sent through mobile

17  applications using numbers from the user's contact list), and (ii) that TextMe's users, rather than

18  TextMe itself, send text messages for purposes of the TCPA. *Id.* at 4.

19  The FCC sought comments on TextMe's petition, and the comment period closed on

20  May 22, 2014. *Consumer & Governmental Affairs Bureau Seeks Comment on Petition for*

21  *Expedited Declaratory Ruling Filed by TextMe, Inc.*, 2014 WL 1364537 (FCC Apr. 7, 2014).

22  Both the Glide Talk and the TextMe petitions seek guidance from the FCC on issues at

23  the heart of Wright's TCPA claim here.  By accepting review of these petitions, the FCC has

24  implicitly acknowledged the need to clarify these issues.  Indeed, the need for resolution of these

25  issues is self-evident given the volume of litigation in this area based on technological advances

26  not dealt with by the statute directly.

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR
STAY (NO. 2:14-cv-00421MJP) - 22

1

2    **2.    FCC Authority Over the Comprehensive TCPA Scheme Favors Staying This Case**

3         The second and third factors of the Ninth Circuit's primary jurisdiction test also favor

4    staying the case.  Congress granted the FCC authority to "execute and enforce the provisions" of

5    the Federal Communications Act, which includes the TCPA.  47 U.S.C. § 151; *Greene v. T-*

6    *Mobile USA, Inc.*, No. C07-1563RSM, 2008 WL 351017, at *3 (W.D. Wash. Feb. 7, 2008).  In

7    addition, Congress expressly charged the FCC with administration of the TCPA.  *See, e.g.,* 47

8    U.S.C. § 227(d).  The courts generally defer to the FCC's lawful interpretations of the TCPA.

9    *See Greene*, 2008 WL 351017, at *3.

10        Lyft contends that the TCPA's statutory definition of "automatic telephone dialing

11   system" is clear and that "invitational texts" initiated by users of mobile phone applications

12   plainly fall outside of the statute.  If the Court disagrees, however, this issue will turn on an

13   interpretation of the TCPA's definition of "automatic telephone dialing system," which the FCC

14   has not previously addressed, and this issue would be appropriately within the FCC's

15   jurisdiction.

16   **3.    The Need for Expertise and Uniformity Weigh Heavily in Favor of Deferring to the FCC on This Issue**

17        The final factor of the Ninth Circuit's primary jurisdiction test also supports a stay.  The

18   FCC is actively considering petitions addressing whether a text message initiated by the user of a

19   mobile phone application through the application's computers has been sent by an ATDS, which

20   is potentially applicable to Wright's TCPA claim.  Staying the case will allow the FCC to apply

21   its expertise to provide for uniform resolution of cases with substantially similar issues.  *Davel*

22   *Commc'ns, Inc.*, 460 F.3d at 1089 ("[T]he central focus of the primary jurisdiction doctrine [is]

23   the desirability of uniform determination and administration for federal policy embodied in the

24   agency's orders."); *Chavrat v. Echostar Satellite, LLC*, 630 F.3d at 466 ("The volume of these

25   lawsuits heightens the risk that individuals and companies will be subject to decisions pointing in

26   opposite directions . . . .").  The FCC's expertise in this technical area puts the agency in the best

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR
STAY (NO. 2:14-cv-00421MJP) - 23

position to opine on these issues in the first instance.  *See Fried v. Sensia Salon, Inc.*, 2013 WL 6195483, at *4.

Accordingly, if the Court does not dismiss the TCPA claims here, Lyft requests this Court stay the proceedings pending the outcome of the two petitions before the FCC, which are likely to answer legal issues at the heart of this suit.

## IV.  CONCLUSION

Wright's allegations based on a single text message fail to state a claim upon which relief may be granted under any of the federal or state statutes asserted in the Amended Complaint. First, Wright failed to allege facts plausibly showing that Lyft used an ATDS as defined by the TCPA or that Lyft made the call.  Additionally, under CEMA, the Amended Complaint fails to state a claim because (i) there is no private right of action under the circumstances asserted, (ii) the text message was not "commercial," and (iii) Wright does not allege that he suffered actual damages from the text message.  Finally, the CPA claim fails because it is derivative of the failed CEMA claim, and, to the extent that claim is independent of the CEMA claim, Wright has not alleged a cognizable injury to business or property.  In the alternative, this Court should stay the proceedings under the doctrine of primary jurisdiction to allow the FCC to make decisions on pending petitions addressing analogous issues.

DATED this 26th day of June, 2014.

BYRNES KELLER CROMWELL LLP

By /s/ Bradley S. Keller
    Bradley S. Keller, WSBA #10665
By /s/ Chelsey L. Mam
    Chelsey L. Mam, WSBA #44609
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA  98104
Telephone:  (206) 622-2000
Facsimile:  (206) 622-2522
Email: bkeller@byrneskeller.com
         cmam@byrneskeller.com
*Attorneys for Defendant Lyft, Inc.*

1

## <u>CERTIFICATE OF SERVICE</u>

2

3          The undersigned attorney certifies that on the 26th day of June, 2014, I electronically
filed the foregoing with the Clerk of the Court using the CM/ECF system which will send
notification of such filing to all counsel on record in the matter.

4

5

6                                              /s/Chelsey L. Mam
                                               Byrnes Keller Cromwell LLP
7                                              1000 Second Avenue, 38th Floor
                                               Seattle, WA  98104
8                                              Telephone:  (206) 622-2000
                                               Facsimile:  (206) 622-2522
9                                              cmam@byrneskeller.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT'S RENEWED MOTION TO DISMISS OR FOR
STAY (NO. 2:14-cv-00421MJP) - 25

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000