THE HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH WRIGHT, on his own behalf and on behalf of other similarly situated persons,

Plaintiff,

v.

LYFT, INC., a Delaware Corporation,

Defendants.

Case No. 2:14−cv−00421−MJP

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR FOR STAY

NOTED ON MOTION CALENDAR:
JULY 18, 2014

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)

HEYRICH KALISH MCGUIGAN PLLC
1325 Fourth Avenue, Suite 540
Seattle, Washington 98101
(206) 838-2504

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................ 2

II.    STATEMENT OF FACTS ................................................................... 2

    A.   Lyft Wants To Multiply Profit By Getting More Consumers To Use Its Application and Services ................................................................................... 2

    B.   Defendant Blasted Consumers With Text Messages Advertising Financial Enticements to Attract New Customers ........................................................ 2

    C.   Defendant Used an ATDS to Send Text Messages to Consumers ................. 3

III.   STANDARD OF REVIEW ................................................................. 4

IV.    LEGAL ANALYSIS ........................................................................... 6

    A.   Defendant Violated the Telephone Consumer Protection Act ....................... 6

        1.   The TCPA must be construed liberally to protect consumers from uninvited calls..... 6

        2.   The TCPA's definition of an ATDS is broadly construed. ......................... 7

        3.   The complaint provides ample notice of Defendant's use of an ATDS. ...................... 8

        4.   The complaint provides ample notice that Defendant sent the text messages............ 10

        5.   *Satterfield v. Simon & Schuster, Inc.* supports Mr. Wright's TCPA claim. ............... 10

    B.   Consumers have a CEMA Damage Claim for Defendant's Improper Text Messages.. 12

        1.   CEMA provides $500 or more to consumers who receive improper text messages.. 12

        2.   The Email Fraud Act did not end CEMA's damages for improper text messages. ... 14

    C.   Consumers have CPA Remedies for Defendant's CEMA Violations ......................... 15

    D.   Mr. Wright's Complaint Establishes that Defendant Violated CEMA......................... 18

    E.   Request for Leave to File Amended Complaint if the Motion to Dismiss is Granted... 22

    F.   Defendant's Request for a Stay Should be Denied ....................................... 22

V.     CONCLUSION .................................................................................. 24

**HEYRICH KALISH MCGUIGAN PLLC**
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

# I. INTRODUCTION

On June 6, 2014, Plaintiff Kenneth Wright filed his First Amended Complaint ("FAC"). *See* Dkt. No. 14. The FAC alleges that Defendant Lyft, Inc. used an automatic telephone dialing system ("ATDS") to send Mr. Wright and consumers like him commercial text messages in violation of the Telephone Consumer Protection Act ("TCPA"), the Washington Commercial Electronic Mail Act ("CEMA"), and the Washington Consumer Protection Act ("CPA").

On June 26, 2014, Defendant filed a motion to dismiss all of Mr. Wrights claims or, alternatively, to stay the case. *See* Dkt. No. 18. Defendant's motion should be denied.

## II. STATEMENT OF FACTS

### A. Lyft Wants To Multiply Profit By Getting More Consumers To Use Its Application and Services

"Defendant is a transportation network company.  Its mobile telephone application ("Lyft"), in conjunction with Defendant's computer systems, create a platform for on-demand peer-to-peer ridesharing."  ("FAC ¶ 2.) "In order to request a Lyft car, a rider must download the Lyft application to their iPhone or Android-based mobile telephone, sign-in through Facebook Connect, and enter a valid telephone number and credit card." (FAC ¶ 11.)

"Defendant receives revenue for each ride arranged through its mobile application.  All payments are made through the application. The payment requested from each rider includes a $1.50 'Pickup Fee,' a $1 'Trust and Safety Fee,' and a ride fee that is calculated based on time ($0.35 per minute) and distance ($1.90 per mile).  Lyft receives the $1 Trust and Safety Fee and 20% of the total fare." (FAC ¶ 12.) Thus, Defendant makes money every time a consumer uses the Lyft app. (FAC ¶ 12.) About 500,000 consumers use the Lyft app. (FAC ¶ 10.)

### B. Defendant Blasted Consumers With Text Messages Advertising Financial Enticements to Attract New Customers

On March 20, 2014, Mr. Wright received the following text message from Defendant: "Jo Ann C. sent you a free Lyft ride worth $25. Claim it at http://lyft.com/getapp/MDI5M215."

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 2

**HEYRICH KALISH MCGUIGAN PLLC**
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

(FAC ¶ 18.) "This message was sent by Defendant's computer systems, which are [automatic telephone dialing systems ("ATDSs")]. It was not sent by 'Jo Ann C.' The originating telephone number that appeared for this message, (415) 403-2454, is from an area code in San Francisco, California, where Defendant is headquartered. This number is used by Defendant to send its automated spam advertising text messages to consumers." (FAC ¶ 19.)

"The SMS text message sent to Plaintiff was typical of messages sent to numerous other consumers. The links in these messages were designed and intended by Defendant to connect Plaintiff and consumers like him to websites through which Defendant offered financial incentives calculated to cause consumers to download and install the Lyft app onto their cellular telephones and to use Defendant's services, thus generating revenue and profit for Defendant. The text messages sent by Defendant's computer systems to Plaintiff and consumers like him all promoted, directly or indirectly, the sale of Defendant's services through the Lyft app. Moreover, the text messages deceptively omit that consumers would have to agree to provide other consideration before Defendant would permit them to use the Lyft app." (FAC ¶ 24)

## C.   Defendant Used an ATDS to Send Text Messages to Consumers

Defendant used an ATDS to send text messages to Mr. Wright and thousands of consumers like him. (*See*, *e.g.*, FAC ¶¶ 17, 19, 43.) Defendant has engineered into the Lyft app a function that collects data from the mobile telephones of users, and then transfers that data to computer systems under Defendant's possession, custody, or control.  In one such feature, the Lyft app harvests, from its users' telephone "contacts," cellular telephone numbers and information regarding third-party consumers who are *not* Lyft app users.  This data is harvested for the sole purpose of sending automated spam advertising text messages to the cellular telephone numbers of consumers who do not use the Lyft app.  (*See*, *e.g.*, FAC ¶¶ 13.)

After harvesting this data, Defendant's computer systems store the telephone numbers, and then Defendant's computer systems automatically transmit programmatically-generated text message advertisements, which are sent to telephone numbers assigned to cellular telephone

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14–cv–00421-MJP)
Page 3

HEYRICH KALISH MCGUIGAN PLLC
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

1  service subscribers.  (FAC ¶¶ 13-17.) "Defendant's computer systems generate[d] [the]

2  commercial advertisements on behalf of Defendant and, in an automated manner, sequentially

3  transmit[ted] these advertisements as unsolicited short message system ("SMS") text messages to

4  stored lists of cellular telephone numbers [including Mr. Wright's telephone number]. (FAC

5  ¶ 17.) Thus, the text message which Mr. Wright received from Defendant "was not sent by 'Jo

6  Ann C'" or any other Lyft app user. (FAC ¶ 19.)  Rather, the text message was sent by

7  Defendant's ATDS from Defendant's corporate headquarters in San Francisco, California. (FAC

8  ¶ 19.)

9           Defendant's ATDS employed "a system of electronic transmission devices which have

10  the capability to send tens of thousands of text messages to consumers in an automated manner,

11  and thereby sent the unsolicited text messages substantially similar, if not identical, to the text

12  message identified above to numerous consumers throughout the United States, including

13  Plaintiff. […] Defendant sent far more text messages than humans could manually transmit in an

14  economical manner." (FAC ¶ 21.)

### III. STANDARD OF REVIEW

15

16           Defendants' motion under Fed. R. Civ.P. 12(b)(6) requests dismissal of Mr. Wright's

17  complaint. "A motion to dismiss under Fed.R.Civ.P. 12(b)(6) tests the sufficiency of the

18  pleadings." *In re Jiffy Lube Int'l, Inc., Text Spam Litig.*, 847 F.Supp.2d 1253, 1256 (S.D. Cal.

19  2012), *citing De La Cruz v. Tormey*, 582 F.2d 45, 48 (9th Cir. 1978). "In ruling on a motion to

20  dismiss, the Court must assume the truth of the plaintiff's allegations and draw all reasonable

21  inferences in the plaintiff's favor." *Gragg v. Orange Cab Co., Inc.* ("*Gragg I*"), C12-0576RSL,

22  2013 WL 195466, *2 (W.D. Wash. Jan. 17, 2013), *citing Usher v. City of Los Angeles,* 828 F.2d

23  556, 561 (9th Cir. 1987).

24           "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the

25  claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the

26  statement need only 'give the defendant fair notice of what the … claim is and the grounds upon

27  which it rests.'" *Erickson v. Pardus,* 551 U.S. 89, 93 (2007), *quoting Bell Atlantic Corp. v.*

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 4

**HEYRICH KALISH MCGUIGAN PLLC**
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

*Twombly,* 550 U.S. 544, 555 (2007), *quoting Conley v. Gibson,* 355 U.S. 41, 47 (1957). Fair notice is given when a complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677-78 (2009), *quoting Twombly,* 440 U.S. at 570.  However, "whether the facts will support the claims alleged by [a plaintiff] is not for this court to determine on the motion before it." *Old Republic Title Ltd. v. Kelley,* C10-0038 JLR, 2010 WL 4259599, *4 (W.D. Wash. Oct. 22, 2010).

"[O]nce a claim for relief has been stated, a plaintiff 'receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.'" *Twombly,* 550 U.S. at 563, *quoting Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir. 1994). "The [Supreme] Court has instructed us that [Rule 8] 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" *Speaker v. U.S. Dept. of Health & Human Services Centers for Disease Control & Prevention,* 623 F.3d 1371, 1380 (11th Cir. 2010), *quoting Twombly,* 550 U.S. at 556. "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds." *Balderas v. Countrywide Bank,* 664 F.3d 787, 791 (9th Cir. 2011). "[N]otice pleading is a low bar to clear." *Panagocos v. Towery,* C10-5018 RBL, 2010 WL 5174767, *1 n. 1 (W.D.Wash. Dec. 15, 2010).

"For all of these reasons, it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6)" *Pacleb v. Cops Monitoring*, 2:14-CV-01366-CAS, 2014 WL 3101426, *2 (C.D. Cal. July 7, 2014). Here, Mr. Wright's complaint provides a short, plain statement of his claims arising from Defendants' illicit transmission of text messages to him and numerous other consumers. Thus, "[t]he facts of this case […] do not amount to the rare situation in which granting a motion to dismiss is appropriate." *See Williams v. Gerber Products Co.,* 552 F.3d 934, 939 (9th Cir. 2008).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 5

HEYRICH KALISH MCGUIGAN PLLC
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

**IV. LEGAL ANALYSIS**

**A.      Defendant Violated the Telephone Consumer Protection Act**

"The TCPA prohibits making 'any call ... using any automatic telephone dialing system ... to any telephone number assigned to a ... cellular telephone service." *Hickey v. Voxernet LLC*, 887 F.Supp.2d 1125, 1129 (W.D. Wash. 2012), *citing* 47 U.S.C. § 227(b)(1)(A). "A text message is a call under the TCPA." *Id.*, *citing Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 954 (9th Cir.2009). "Courts have found a '[Defendant] can be held liable even if it did not physically send the messages at issue' as long as Plaintiff plausibly alleges Defendant ultimately controlled sending the message." *Id.*, *citing In re Jiffy Lube Int., Inc. Text Spam Litigation,* 847 F.Supp.2d 1253, 1258–59 (S.D.Cal.2012); *also see Thomas v. Taco Bell Corp.*, -- Fed. App'x. --, 12-56458, 2014 WL 2959160, *1 (9th Cir. July 2, 2014) (noting that persons can be either directly liable or vicariously liable for a TCPA violation).

Defendant contends that it did not use an ATDS and that it did not send the automated text message which Mr. Wright received. In making these arguments, Defendant fails to acknowledge that the factual allegations as pleaded directly contradict Defendant's assertions. Moreover, Defendant asks the Court to adopt brand new interpretations of the TCPA that would undermine well-established interpretations of the TCPA, which advance the statute's remedial purpose of protecting consumers like Mr. Wright.

**1.      The TCPA must be construed liberally to protect consumers from uninvited calls.**

The TCPA prohibition at issue in this case was enacted because "telephone subscribers considered automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy[.]" 27 F.C.C.R. 1830, 1839 ¶ 24 (Feb. 15, 2012), *citing* 137 Cong. Rec. H11307 (Daily Ed. Nov. 26, 1991); *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 268 (3d Cir. 2013) ("Congress passed the TCPA to protect individual consumers from receiving intrusive and unwanted calls."), *citing Mims v. Arrow Fin. Servs., LLC,*132 S.Ct. 740, 745 (2012). Thus, the TCPA is a remedial statute, which should be construed

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 6

**HEYRICH KALISH MCGUIGAN PLLC**
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

broadly to benefit consumers. *See Gager*, 727 F.3d at 271 ("Because the TCPA is a remedial statute, it should be construed to benefit consumers."); *c.f. Hason v. Med. Bd. of California*, 279 F.3d 1167, 1172 (9th Cir. 2002) (affirming the "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes"), *quoting Tcherepnin v. Knight,* 389 U.S. 332, 336 (1967).

### 2.      The TCPA's definition of an ATDS is broadly construed.

"The term 'automatic telephone dialing system' means 'equipment that has the capacity—(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers.'" *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012) *cert. denied*, 133 S.Ct. 2361 (U.S. 2013), *citing* 47 U.S.C. § 227(a)(1). The FCC has confirmed consistently that this definition should be read expansively to ensure that the TCPA's prohibitions are not circumvented:

> The Commission has emphasized that this definition covers any equipment that has the specified *capacity* to generate numbers and dial them without human intervention regardless of whether the numbers called are randomly or sequentially generated or come from calling lists. [Citation omitted.] The Commission has, for example, concluded that the scope of that definition encompasses "hardware that, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers," in light of, among other things, its conclusion that "the purpose of the requirement that equipment have the 'capacity to store or produce telephone numbers to be called' is to ensure that the prohibition on autodialed calls not be circumvented." [Citation omitted.]

27 F.C.C.R. 15391 n. 5 (Nov. 29, 2012). "As one commenter points out, the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. The basic function of such equipment, however, has not changed—the *capacity* to dial numbers without human intervention." *Meyer*, 707 F.3d at 1043, *citing* 18 F.C.C.R. 14014, 14092 (July 3, 2003).

Accordingly, the FCC has determined "that an ATDS may include equipment that automatically dials numbers from a stored list without human intervention, even when the equipment lacks the capacity to store or produce telephone numbers to be called, using a random or sequential number generator." *Sterk v. Path, Inc.*, --- F.Supp.2d ----, 13 C 2330, 2014 WL

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14–cv–00421-MJP)
Page 7

HEYRICH KALISH MCGUIGAN PLLC
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

2443785, *3 (N.D. Ill. May 30, 2014). This interpretation is due deference from the courts because it is reasonable. *See Lardner v. Diversified Consultants Inc.*, --- F.Supp.2d ----, 1:13-CV-22751-UU, 2014 WL 1778960 (S.D. Fla. May 1, 2014) ("Having found that Congress did not directly address this issue, the Court finds that the FCC's interpretation regarding what constitutes an ATDS under the TCPA is reasonable."); *c.f. Meyer*, 707 F.3d at 1043; *Satterfield*, 569 F.3d at 952 ("An agency's interpretation is permissible, unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'"), *citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778 (1984).

Adhering to the FCC's guidance, most courts, including this Court, "have found equipment to qualify as an ATDS if it can dial numbers automatically, for example by calling or sending text messages to numbers in a preprogrammed list, irrespective of the presence of a random or sequential number generator." *Legg v. Voice Media Grp., Inc.*, --- F.Supp.2d ----, 13-62044-CIV, 2014 WL 2004383 (S.D. Fla. May 16, 2014), *citing Hickey*, 887 F.Supp.2d at 1129-30 (citing 2003 FCC order to determine that "systems that automatically dial cell phone numbers from a preprogrammed list" fall within the ATDS definition); *Fields v. Mobile Messengers Am., Inc.,* 12–05160, 2013 WL 6774076, *3 (N.D. Cal. Dec. 23, 2013) (citing 2003 FCC order and finding that evidence of text messages sent without human intervention was sufficient to preclude summary judgment on whether ATDS was used); *Lardner*, 2014 WL 1778960, *5 (citing 2003 FCC order to determine that "systems that automatically dial cell phone numbers from a preprogrammed list" fall within ATDS definition).

### 3. The complaint provides ample notice of Defendant's use of an ATDS.

In denying a motion to dismiss a TCPA claim, this Court "recognizes the difficulty a plaintiff faces in knowing the type of calling system used without the benefit of discovery." *Hickey*, 887 F.Supp.2d at 1130. Accordingly, when considering similar motions to dismiss, most district courts—including this Court—have not required much beyond an allegation that defendants used an ATDS. *See id.*, at 1129-30, *quoting Knutson v. Reply!, Inc.,* 10CV1267, 2011 WL 1447756, *1 (S.D. Cal. Apr. 13, 2011); *also see Peatrowsky v. Persolve*, 2:12-CV-00935-

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 8

**HEYRICH KALISH McGUIGAN PLLC**
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

JAD, 2014 WL 1215061, *4 (D. Nev. Mar. 24, 2014) ("A number of courts have determined that the alleged use of an ATDS—without specifically alleging the statutory definition—was sufficient to state a claim."), *citing Brown v. Hosto & Buchan, PLLC,* 748 F.Supp.2d 847, 859 (W.D. Tenn. 2010); *Pacleb*, 2014 WL 3101426, *4 ("Plaintiff alleges that the defendant called him using an ATDS. […] Whether defendant actually did so is better adjudicated after the evidentiary record has been developed."); *Gross v. Wells Fargo Bank*, 13-CV-1250-W BGS, 2014 WL 232272, *6 (S.D. Cal. Jan. 21, 2014) ("Because Mr. Gross alleged that these calls were made by an automated dialing system […], and since the Court must take all material allegations of fact as true and construe the complaint in a light most favorable to the Mr. Gross, the Court DENIES Wells Fargo's motion on this ground."); *Kristensen v. Credit Payment Services Inc.*, 2:12-CV-00528-KJD, 2013 WL 686492, *2 (D. Nev. Feb. 22, 2013) ("Here, Plaintiff has alleged that Defendant, or its agents, made text message calls using an automatic telephone dialing system to a cellular telephone number. Those facts are enough to make a short and plain statement showing that Plaintiff is entitled to relief.), *citing Twombly,* 555 U.S. at 570; *Makowski v. First Nat. of Nebraska, Inc.*, 12-cv-02280-CMA, 2013 WL 754922, *8 (D. Colo. Feb. 6, 2013); *In re Jiffy Lube Int'l, Inc.,* 847 F.Supp.2d at 1260 ("Plaintiffs have stated that they received a text message from an SMS short code and that the message was sent by a machine with the capacity to store or produce random telephone numbers. While additional factual details about the machines might be helpful, further facts are not required to move beyond the pleading stage."); *In re Pryor*, 479 B.R. 694, 702-703 (E.D.N.C. 2012) (finding bare allegation that "defendants used an 'automated telephone dialing system'" to be sufficient under Rule 12(b)(6)).

Here, it is indisputable that the complaint provides sufficient notice as required by Rule 8 that the capabilities of Defendant's dialing equipment will be a material fact at issue in this case. Mr. Wright's complaint clearly provides more than a bare allegation that Defendant used an ATDS to send him and others text messages in violation of the TCPA. *See supra*, § II(B). Thus, Mr. Wright has "provided sufficient detail to make a plausible claim under the TCPA and to

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 9

**HEYRICH KALISH MCGUIGAN PLLC**
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

allow for discovery of further evidence related to [Defendant's] ATDS functionality." *Hickey*, 887 F.Supp.2d at 1130.

> **4.      The complaint provides ample notice that Defendant sent the text messages.**

Defendant also attempts to introduce extrinsic evidence and raise inferences in its favor to argue that it had no control or responsibility for the text message, even though the messages were sent using Defendant's equipment, which Defendant engineered and operated to send its text message spam. However, "[o]n a motion to dismiss, the Court accepts all well-pleaded allegations of material fact as true and draws all reasonable inferences in favor of the plaintiff." *Hickey*, 887 F.Supp.2d at 1128, *citing Wyler Summit P'ship v. Turner Broad. Sys.,* 135 F.3d 658, 661 (9th Cir. 1998). Therefore, Defendant's extrinsic evidence and self-serving inferences should be stricken and otherwise disregarded by the Court in considering the sufficiency of Mr. Wright's complaint.

Moreover, Mr. Wright's complaint establishes that Defendant's ATDS—not a Lyft app user—initiated the transmission of the text message which Mr. Wright received. *See supra*, § II(B). Defendant offered its customers a $25 enticement to provide consumer data for text message marketing purposes.  Defendant's computer systems then harvested the electronic consumer data. *See* FAC ¶¶ 13-17. But it is Defendant's automated text message transmissions, not its automated acquisition of telephone numbers, which gives rise to a TCPA claim. *See*, *e.g.*, *Sterk*, 2014 WL 2443785, *4 ("The undisputed evidence shows that the equipment used by Path's agent made calls from the list without human intervention. It is such calling that the section of the TCPA at issue in this case covers, not the collection of numbers for storage.").

> **5.      *Satterfield v. Simon & Schuster, Inc.* supports Mr. Wright's TCPA claim.**

Defendant contends that the Court should focus on how Defendant acquired the telephone numbers which its ATDS dialed in an automated manner.  Such an approach would follow in the footsteps of a district court ruling that the Ninth Circuit reversed. *See Satterfield v. Simon & Schuster*, C 06-2893 CW, 2007 WL 1839807, *2-6 (N.D. Cal. June 26, 2007) *rev'd and remanded sub nom. Satterfield*, 569 F.3d 946.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 10

HEYRICH KALISH MCGUIGAN PLLC
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

In *Satterfield*, the district court noted the undisputed facts which established multiple steps taken by humans to create and then load telephone numbers lists into dialing equipment;

> The process for sending the promotional text was as follows: MIA provided Defendant ipsh! with electronic plain text or Excel files containing the list of 100,000 mobile numbers of Nextones subscribers; the list came in a series of emails, broken up by the age of the intended recipients. The emails were forwarded to a programmer who then imported the list into a database, which was set up specifically for the Stephen King campaign and which was located on Defendant ipsh!'s server. Defendant ipsh!'s employees entered the relevant information for the promotional messages, including the text of the messages and the time they were to be sent, and packed the messages in "XML" format; the XML messages were stored on Defendant ipsh!'s server until they were programmed to be sent to the intended recipients.

> The text messages promoting *Cell* were intended to go out at 12:30 p.m. Before the intended receiver could receive the message, however, Defendant ipsh!'s program had to send the XML message, or file, to mBlox, Inc., an "aggregator," or mobile transaction networking services company. mBlox handled the actual transmission of the text messages to the wireless carriers; unlike Defendant ipsh!'s computers, mBlox's computers have the ability to determine to which telephone carriers to send each set of data and then send it to the appropriate carrier. Defendant ipsh!'s employee mistakenly set the program to begin automatically to send the XML messages at 12:30 a.m.

*Satterfield*, 2007 WL 1839807, *2. Thus, the *Satterfield* district court placed importance on humans having to perform at least seven manual actions before a single text message was sent. *See id*. And based upon these facts, the *Satterfield* district court ruled, "Because it is undisputed that the equipment here does not store, produce or call randomly or sequentially generated telephone numbers, the Court grants summary judgment in Defendants' favor: the equipment at issue is not an automatic telephone dialing system under the TCPA." *See id.*, at *6. However, the Ninth Circuit reversed the *Satterfield* district court's summary judgment dismissal of a TCPA claim by holding "that there is a genuine issue of material fact with regard to whether this equipment has the requisite capacity." *See Satterfield*, 569 F.3d at 951.

Accordingly, the Ninth Circuit confirmed that dialing equipment can be an ATDS even if it takes seven or more human actions to input telephone numbers for an ATDS to call. *See Satterfield*, 2007 WL 1839807, *2; *c.f. Satterfield*, 569 F.3d at 951. In contrast, here, it is undisputed that Lyft app users merely needed to acquiesce and Defendant's computer systems would automatically extract all of the telephone numbers stored on the Lyft app user's telephone

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 11

HEYRICH KALISH MCGUIGAN PLLC
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

1   to Defendant's dialing system. *See* FAC ¶¶ 13-17. And Defendant's dialing system automatically

2   generated and transmitted text messages of Defendant's own creation to the acquired lists of

3   telephone numbers. *See*, *e.g.*, FAC ¶ 19.

4          Mr. Wright's complaint provides ample notice that Defendant's dialing system is an

5   ATDS under the TCPA. *See*, *e.g.*, *Sterk*, 2014 WL 2443785, *4. Mr. Wright respectfully requests

6   that the Court deny Defendant's motion to dismiss his claim under the TCPA.

7   **B.      Consumers have a CEMA Damage Claim for Defendant's Improper Text Messages**

8          In "AN ACT Relating to electronic mail", Washington created CEMA in 1998. *See* 1998

9   Wn. Legis. Serv. Ch. 149 (S.H.B. 2752) (WEST); *c.f.* RCWA 19.190.010, *et seq*. Five years

10  later, in "AN ACT Relating to commercial text messages", Washington amended CEMA to

11  prohibit the transmission of uninvited text messages. *See* 2003 Wn. Legis. Serv. Ch. 137 (S.H.B.

12  2007); *c.f.* RCWA 19.190.010, RCWA 19.190.040, RCWA 19.190.060, and RCWA 19.190.070.

13  Thus, CEMA regulates the transmission of commercial text messages;

14          No person conducting business in the state may initiate or assist in the transmission of an
15          electronic commercial text message to a telephone number assigned to a Washington
           resident for cellular telephone or pager service that is equipped with short message
16          capability or any similar capability allowing the transmission of text messages.

17  RCW 19.190.060(1). Moreover, CEMA provides that each recipient of an improper commercial

18  text message incurs at least $500 in damages;

19          Damages to the recipient of a […] commercial electronic text message sent in violation of
           this chapter are five hundred dollars, or actual damages, whichever is greater.
20
    RCW 19.190.040(1). Thus, as observed by the Washington Supreme Court, CEMA provides

21  "$500 or actual damages, whichever is greater, for [an] improper commercial text message".

22  *Perez-Farias v. Global Horizons, Inc.*, 175 Wn.2d 518, 533, 286 P.3d 46 (2012), *citing* RCW

23  19.190.040(1).

24          **1.      CEMA provides $500 or more to consumers who receive improper text
                      messages.**
25
           The Washington Supreme Court commands that courts "construe remedial statutes
26
    liberally in accordance with the legislative purpose behind them." *Jametsky v. Olsen*, 179 Wn.2d
27

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 12

**HEYRICH KALISH MCGUIGAN PLLC**
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

756, 763, 317 P.3d 1003 (2014); *Nucleonics Alliance, etc. v. WPPSS*, 101 Wn.2d 24, 29, 677 P.2d 108 (1984) ("A policy requiring liberal construction is a command that the coverage of an act's provisions be liberally construed and that its exceptions be narrowly confined."). This means that courts should "construe remedial consumer protection statutes [...] liberally in favor of the consumers they aim to protect." *Jametsky*, 179 Wn.2d at 765. Importantly, the Washington Supreme Court recently held that remedial statutes must be construed liberally in favor of their consumer protection purpose even when statutory text is unambiguous. *See id.* at 763-64 (finding that a remedial statute "is not ambiguous"); *c.f. id.* at 764-65 (requiring an interpretation of the remedial statute to provide consumers "more rather than less protection").

The Washington Supreme Court finds evidence of a statute's remedial purpose in a statutory declaration that its violation "is 'an unfair method of competition' for the Consumer Protection Act" and that "the practices covered by [the statute] are matters vitally affecting the public interest." *Jametsky*, 179 Wn.2d at 764. CEMA makes this same declaration concerning the remedial purpose of its text message prohibition. *See* RCW 19.190.060(2).

CEMA further provides statutory damages to compensate consumers for injuries they incur when they receive improper text messages. *See* RCW 19.190.040(1). The Washington Supreme Court also finds evidence of a remedial purpose through such statutory damage provisions. *See Jametsky*, 179 Wn.2d at 764-65; *Perez-Farias*, 175 Wn.2d at 529-30 (liberally construing a statutory damages provision because the "civil remedies provision was enacted to compensate injuries, promote enforcement of the [statute], and deter violations").

Moreover, Washington's legislature plainly stated the remedial purpose of CEMA's commercial text message provisions in the very first section of the 2003 legislative "ACT Relating to commercial text messages" that added the text message subsections to CEMA:

> The legislature recognizes that the number of unsolicited commercial text messages sent to cellular telephones and pagers is increasing. This practice is raising serious concerns on the part of cellular telephone and pager subscribers. These unsolicited messages often result in costs to the cellular telephone and pager subscribers in that they pay for use when a message is received through their devices. The limited memory of these devices can be exhausted by unwanted text messages resulting in the inability to receive necessary and expected messages.

> The legislature intends to limit the practice of sending unsolicited commercial text messages to cellular telephone or pager numbers in Washington.

2003 Wn. Legis. Serv. Ch. 137 § 1 (S.H.B. 2007).

CEMA's commercial text message provisions should be interpreted liberally to advance all of these consumer protection purposes. *See Jametsky*, 179 Wn.2d at 764-65. In this regard, just two years ago, the Washington Supreme Court held that statutory damage awards provided by CEMA and other remedial statutes "are nondiscretionary and 'automatic.'" *See Perez-Farias*, 175 Wn.2d at 533; *c.f. id.*, at 529-30 ("we consider and adopt the reading that best furthers the purposes of the statute"). Thus, Washington law provides consumers like Mr. Wright with no less than $500 in damages when they receive an improper text message. *See Perez-Farias*, 175 Wn.2d at 533, *citing* RCW 19.190.040(1); *and see Gragg v. Orange Cab Co., Inc.* ("*Gragg II*"), 942 F.Supp.2d 1111, 1118 n. 6 (W.D. Wash. 2013) ("That provision [RCW 19.190.040(1)] retains its meaning because it provides statutory damages upon proof of a violation of CEMA."); *c.f. Gragg I*, 2013 WL 195466, **3-5.

### 2. The Email Fraud Act did not end CEMA's damages for improper text messages.

In a 2005 "ACT relating to electronic mail fraud," Washington amended CEMA to regulate electronic mail fraud. *See* 2005 Wn. Legis. Serv. Ch. 378 (S.S.H.B. 1888); *c.f.* RCWA 19.190.080, RCWA 19.190.090, RCWA 19.190.100, and RCWA 19.190.110. Defendant argues that one of the subsections enacted by this Email Fraud Act, RCW 19.190.090, might preclude Mr. Wright's text message claim. This argument fails.

Two years after adding text messaging prohibitions to CEMA, Washington enacted the following subsection as part of Washington's Email Fraud Act:

> A person who is injured under this chapter may bring a civil action in the superior court to enjoin further violations, and to seek up to five hundred dollars per violation, or actual damages, whichever is greater. A person who seeks damages under this subsection may only bring an action against a person or entity that directly violates RCW 19.190.080.

RCWA 19.190.090(1). Defendant contends that the second sentence eliminates Mr. Wright's right to seek any damages because Defendant violated RCW 19.190.060(1) and not RCW

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 14

HEYRICH KALISH MCGUIGAN PLLC
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

19.190.080. However, Defendant fails to acknowledge that this sentence applies to persons who seek "damages under this subsection." *See id*. Mr. Wright does not seek damages under this subsection. Rather, Mr. Wright seeks damages under a different subsection, RCW 19.190.040(1).

While the legislature amended a few parts of CEMA in the 2005 Email Fraud Act, the legislature did not alter any part of CEMA concerning text messages. *See* 2005 Wn. Legis. Serv. Ch. 378 (S.S.H.B. 1888). This means that Defendant's argument really is that the enactment of RCW 19.190.090(1) in 2005 *impliedly* repealed the claim for damages that Washington provided its consumers in 2003 with RCWA 19.190.040(1). However, "[r]epeal by implication is strongly disfavored. […] The legislature is presumed to be aware of its own enactments, and the court will presume that the legislature did not intend to repeal a statute impliedly if the legislature has provided an express list of statutes to be repealed." *ATU Leg. Council of Wn. State v. State*, 145 Wn.2d 544, 552, 40 P.3d 656 (2002) (citation omitted). Washington's legislature declined to repeal or amend CEMA's express provisions concerning commercial text messages. *See* 2005 Wn. Legis. Serv. Ch. 378 (S.S.H.B. 1888). Therefore, courts should continue to construe CEMA's text message provisions broadly in favor of the consumers they are intended to protect. *See Jametsky*, 179 Wn.2d at 764-65.

Ultimately, Washington courts "are loathe to find a silent repeal" of any statute. *Johnson v. Recreational Equip., Inc.*, 159 Wn. App. 939, 950, 247 P.3d 18 (2011). And there is no need to do so here. Coming into existence about seven years after CEMA's first enactment, RCW 19.190.090(1) does not state that its provisions are the only means by which consumers can seek damages for CEMA violations. CEMA can and should be construed to allow statutory damage awards for consumers who receive improper text messages *and* for consumers who receive fraudulent emails. *See* RCW 19.190.040(1); *c.f.* RCW 19.190.090(1). Defendant's motion to dismiss Mr. Wright's CEMA claim should be denied.

**C.   Consumers have CPA Remedies for Defendant's CEMA Violations**

"To prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a

person's business or property, and (5) causation." *Panag v. Farmers Ins. Co. of Wn.*, 166 Wn.2d 27, 37, 204 P.3d 885 (2009), *citing Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784, 719 P.2d 531 (1986). A per se violation of a statute also can create a CPA claim. *See Klem v. Washington Mut. Bank*, 176 Wn.2d 771, 787, 295 P.3d 1179 (2013) ("To resolve any confusion, we hold that a claim under the Washington CPA may be predicated upon a per se violation of statute[.]"). In both respects, "[t]he CPA is to be 'liberally construed that its beneficial purposes may be served.'" *Panag*, 166 Wn.2d at 37., *quoting* RCW 19.86.920.

Defendant does not dispute that a CEMA violation establishes the first three elements of a CPA claim. *See Gragg II*, 942 F.Supp.2d at 1117 ("If violated, CEMA unambiguously establishes only the first three *Hangman Ridge* elements[.]"), *citing* RCW 19.190.060. Rather, Defendant argues that Mr. Wright's receipt of Defendant's text message might not be an injury sufficient to sustain a CPA claim. *See id*. Defendant's contention fails.

RCW 19.190.060(2) and RCW 19.190.040(1) were enacted by Washington's legislature in the same "ACT Relating to commercial text messages". *See* 2003 Wn. Legis. Serv. Ch. 137 § 3; *c.f. id.* § 5. Given the shared purpose of these two subsections of CEMA, they should be harmonized by construing them together. *Christensen v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007) ("Statutory provisions and rules should be harmonized whenever possible.").

While Defendant concedes that RCW 19.190.060(2) satisfies most of the elements for a CPA claim, Defendant fails to acknowledge that RCW 19.190.040(1) expressly states, "Damages to the recipient of a […] commercial electronic text message […] are five hundred dollars, or actual damages, whichever is greater." This is the exact same language that the legislature used to establish the CPA's injury prerequisite in at least one other telecommunications consumer protection statute. *See* RCW 80.36.540(5) ("Damages to the recipient of telefacsimile messages in violation of this section are five hundred dollars or actual damages, whichever is greater."); *c.f. Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 645 (W.D. Wash. 2007) ("A violation of [RCW 80.36.540] is also a violation of the CPA."). Thus, the legislature decreed that Mr. Wright did suffer a $500 injury when he received Defendant's improper text message. The Washington

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 16

**HEYRICH KALISH MCGUIGAN PLLC**
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

Supreme Court requires courts to respect this legislative decree. *See Hangman Ridge*, 105 Wn.2d at 787 ("Where the Legislature specifically defines the exact relationship between a statute and the CPA, this court will acknowledge that relationship.").

Defendant may now attempt to argue that the $500 damages declared by Washington's legislature are unrelated to the "injury to property" element of a CPA claim. Of course, this argument would ignore the legislature's prior uses of this very same damages language to establish per se CPA violations in other consumer protection statutes. *See* RCW 80.36.540(5); *c.f. Kavu, Inc.*, 246 F.R.D. at 645. Moreover, this argument would ignore that the legislature's stated purpose for its "ACT Relating to commercial text messages," which was, in part, to address how "[t]he limited memory of [cellular telephones] can be exhausted by unwanted text messages resulting in the inability to receive necessary and expected messages." *See* 2003 Wn. Legis. Serv. Ch. 137 § 1. In fact, Mr. Wright suffered this very injury to his cellphone. *See*, *e.g.*, FAC ¶ 27(c)-(e). And any such "loss of use of property" can create an actionable injury under the CPA. *See Panag*, 166 Wn.2d at 58, *citing Webb v. Ray*, 38 Wn. App. 675, 688 P.2d 534 (1984).

But ultimately, Mr. Wright respectfully requests that the Court find that RCW 19.190.060 and RCW 19.190.040(1) are remedial statutes which, whether unambiguous or not, must be construed "liberally in accordance with the legislative purpose behind them." *See Jametsky*, 179 Wn.2d 763-65. The legislature plainly stated that the purpose of these statutes is "to limit the practice of sending unsolicited commercial text messages to cellular telephone or pager numbers in Washington." *See* 2003 Wn. Legis. Serv. Ch. 137 § 1. So the essential legal question here is whether this purpose is better advanced by allowing Mr. Wright and consumers like him to pursue CPA claims against defendants who send improper text messages in violation of CEMA. *See Jametsky*, 179 Wn.2d 764-65; *also see Whitehead v. Dep't of Social and Health Services*, 92 Wn.2d 256, 270, 595 P.2d 926 (1979) ("A thing which is within the object, purpose and spirit of an enactment is as much within the act as if it were within the letter.").

If, as Defendant argues incorrectly in its motion, CEMA provides no private cause of action for consumers who receive illegal text messages, then the Court should rule that

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14-cv-00421-MJP)
Page 17

HEYRICH KALISH MCGUIGAN PLLC
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

consumers like Mr. Wright have a CPA claim. The legislature made clear that its purpose is for consumers like Mr. Wright to recover at least $500 in damages for each improper text message they receive. Whether directly through CEMA or through the CPA, consumers must have a private cause of action because the legislature decreed in RCW 19.190.040(1) that consumers are to receive at least $500 for each improper text message they receive. *See Perez-Farias*, 175 Wn.2d at 533; *c.f. id.*, at 529-30 ("we consider and adopt the reading that best furthers the purposes of [a] statute").

But as explained earlier in this response brief, CEMA provides a private cause of action for consumers to recover the damages awarded to them by RCW 19.190.040(1). *See*, *e.g.*, *Gragg I*, 2013 WL 195466, **3-5. Nonetheless, the legislature's plainly stated purpose in enacting this statute together with RCW 19.190.060 is better accomplished if consumers like Mr. Wright can remedy a defendant's statutory violations through the CPA. Unlike RCW 19.190.040(1) alone, the CPA expressly provides consumers with the ability to obtain injunctive relief, to recover attorney's fees, and to obtain treble damages. *See* RCW 19.86.090.

Liberally construing RCW 19.190.040(1) together with RCW 19.190.060(2), as the Washington Supreme Court commands, means that a consumer's bare receipt of an illegal text message should give the consumer the ability under the CPA to obtain an injunction to stop the improper conduct and recover damages. *See Jametsky*, 179 Wn.2d at 764-65; *c.f. Perez-Farias*, 175 Wn.2d at 529-30 (liberal construction is necessary because the "civil remedies provision was enacted to compensate injuries, promote enforcement of [a statute], and deter violations"). Accordingly, Mr. Wright respectfully submits that consumers like him have a private right of action through the CPA to obtain injunctive relief, damages, and attorney's fees from Defendant for its violations of CEMA's commercial text message prohibitions.

**D.    Mr. Wright's Complaint Establishes that Defendant Violated CEMA**

CEMA prohibits the transmission of "electronic commercial text message[s]". *See* RCW 19.190.060(1). Defendant does not dispute that it transmitted text messages to Mr. Wright and consumers like him. Rather, Defendant contends that its text messages were not commercial

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 18

**HEYRICH KALISH MCGUIGAN PLLC**
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

text messages, which are defined as "an electronic text message sent to promote real property, goods, or services for sale or lease." RCW 19.190.010(3). There is no guidance from Washington appellate courts interpreting this definition. Defendant cites a 2012 order by this Court to argue that the text message it sent to Mr. Wright was not a commercial text message under CEMA. *See Hickey*, 887 F.Supp.2d at 1132. However, just months after this Court issued its *Hickey* order, the Ninth Circuit published an opinion, ignored by Defendant, which bears directly upon the meaning of this term. *See Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913 (2012).

In *Chesbro*, the Ninth Circuit considered a case where Best Buy made automated telephone calls with a script which advised its customers about changes being made to its Reward Zone program. *See Chesbro*, 705 F.3d at 915-17. Best Buy argued that "its calls were purely informational courtesy calls" rather than commercial calls "because the scripts did not explicitly reference any property, goods, or services." *See id.* at 918. The Ninth Circuit rejected Best Buy's argument by applying common sense:

> We approach the problem with a measure of common sense. The robot-calls urged the listener to "redeem" his Reward Zone points, directed him to a website where he could further engage with the RZP, and thanked him for "shopping at Best Buy." Redeeming Reward Zone points required going to a Best Buy store and making further purchases of Best Buy's goods. There was no other use for the Reward Zone points. Thus, the calls encouraged the listener to make future purchases at Best Buy. ***Neither the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context. Any additional information provided in the calls does not inoculate them.***

*Id.* (emphasis added), *citing TCPA Rules*, 18 F.C.C.R. at 14098-99 ¶ 142. "Because the calls encouraged recipients to engage in future purchasing activity," the Ninth Circuit held that "they also constituted telemarketing […]." *See id.* (emphasis added).

Similarly, here, by encouraging Mr. Wright and other consumers to download and use the Lyft app, Defendant's text messages "encouraged recipients to engage in future purchasing activity". *See supra* § II(A); *c.f. Chesbro*, 705 F.3d at 918. While the Lyft app by itself *might* be free to download, the Lyft app is not free to use. *See* FAC ¶ 12 (describing fees that Lyft app users must pay to use it even with a $25 credit). Defendant receives *at least* $1 every time

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 19

**HEYRICH KALISH MCGUIGAN PLLC**
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

someone uses the Lyft app. FAC ¶ 12. Thus, Defendant's text messages are commercial text messages.

Moreover, *Chesbro* instructed courts to "approach the problem with a measure of common sense" to determine if a message "encouraged the [recipient] to make future purchases at [a defendant]." *See Chesbro*, 705 F.3d at 518. Here, even if the download of the Lyft app, even if the Lyft app were free to use, and even if the entire first ride was genuinely free no matter its duration, the only sensible reason for Defendant to offer a "free" app with a "free" ride to consumers is if Defendant expects to make much more revenue through the app from future ride purchases. *See* FAC ¶ 24. The Ninth Circuit holds that such promotional messages are telemarketing as regulated by the TCPA. *See Chesbro*, 705 F.3d at 518.

Defendant was wrong to ignore *Chesbro* when it filed its motion. The Ninth Circuit specifically held that its ruling applied to the definition of a "commercial solicitation" as that term is used in Washington's Automatic Dialing and Announcing Device Act ("WADAD");

> The WADAD similarly prohibits using an automatic dialing and announcing device "for purposes of commercial solicitation." Wash. Rev.Code § 80.36.400(2) (2012). "Commercial solicitation means the unsolicited initiation of a telephone conversation for the purpose of encouraging a person to purchase property, goods, or services." Wash. Rev. Code § 80.36.400(1)(b). A violation of the WADAD is automatically a violation of the Washington Consumer Protection Act ("WCPA"). *See* Wash. Rev. Code § 80.36.400(3).

*Chesbro*, 705 F.3d at 519. With the WADAD, just as with CEMA, "[w]e have no guidance from the Washington courts on how Washington interprets these provisions." *Id*. However, "[t]he text of the WADAD is substantially similar to its federal counterpart [in the TCPA], as is its purpose." *Id*. Therefore, the Ninth Circuit applied TCPA authority and reasoning to resolve the question of whether a defendant's automated telephone message to consumers was a commercial communication under the WADAD. *See id*. The Ninth Circuit's application of TCPA authority and reasoning to the WADAD also applies to CEMA. *See Gragg I*, 2013 WL 195466, **3-5.

How "commercial text message" is used in CEMA is remarkably similar to how "commercial solicitation" is used in the WADAD. *See* RCW 19.190.010(3) ("Commercial text message" concerns telephone messages made "to promote real property, goods, or services for

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14–cv–00421-MJP)
Page 20

HEYRICH KALISH MCGUIGAN PLLC
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

sale or lease"); *c.f.* RCW 80.36.400(1)(b) ("commercial solicitation" concerns automated telephone calls made "for the purpose of encouraging a person to purchase property, goods, or services"). Moreover, prohibitions on voice messages and text messages protect the same, substantive interests of consumers. *See Satterfield*, 569 F.3d at 954 ("[A] voice message or a text message are not distinguishable in terms of being an invasion of privacy."); RCW 80.36.400 notes (1986) ("it is in the public interest to prohibit the use of automatic and announcing devices for purposes of commercial solicitation"); RCW 19.190.060(2) ("the practices covered by this section are matters vitally affecting the public interest"). Thus, both the WADAD and CEMA share similarities and purpose with portions of the TCPA in regulating commercial telephonic communications. *See Chesbro*, 705 F.3d at 917 (exempting from some TCPA prohibitions "automated commercial calls […] that […] 'do not include or introduce an unsolicited advertisement or constitute a telephone solicitation'"), *citing* 47 C.F.R. § 64.1200(a)(2)(iii) (2011) (amended 2012). Because the Ninth Circuit determined that TCPA authority and reasoning should be used to interpret the WADAD, TCPA authority and reasoning should also be used to interpret the CEMA. *See Gragg I*, 2013 WL 195466, *4 n. 4 ("Because the definitions set forth in the WADAD and CEMA are much more closely aligned than the related provision of the TCPA, the interpretive rulings under federal law should be applied to both state laws.").

Accordingly, the Ninth Circuit's precedent in *Chesbro* confirms that the text message which Mr. Wright received from Defendant was a commercial text message prohibited by CEMA.  Thus, for example, the Court in *Gragg* concluded as follows:

> While the Taxi Magic app itself was, like the toll free number mentioned in the FCC's Report and Order, offered at no cost, the only purpose of the offer was to promote or encourage the use of defendants' taxi services. Under the Ninth Circuit's analysis in *Chesbro*, one could reasonably conclude that the text promoted future commercial transactions and triggered CEMA. In addition, prohibiting unsolicited text messages that purport to offer a "free" download or link designed to result in future purchases comports with the legislative findings and intent in enacting CEMA.

*Gragg v. Orange Cab Co., Inc.*, C12-0576RSL, 2013 WL 195466, *4 (W.D. Wash. Jan. 17, 2013).  Defendant's motion should be denied because "[t]he facts of this case […] do not amount

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14–cv–00421-MJP)
Page 21

**HEYRICH KALISH MCGUIGAN PLLC**
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

to the rare situation in which granting a motion to dismiss is appropriate." *See Williams v. Gerber Products Co.*, 552 F.3d 934, 939 (9th Cir. 2008).

**E.        Request for Leave to File Amended Complaint if the Motion to Dismiss is Granted**

"Where a complaint is dismissed for failure to state a claim, 'leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *Edifecs, Inc. v. TIBCO Software, Inc.*, 756 F.Supp.2d 1313, 1322 (W.D. Wash. 2010) (citation omitted). Therefore, if the Court finds that any claim might be dismissed, Mr. Wright requests leave to file an amended complaint.

**F.        Defendant's Request for a Stay Should be Denied**

Defendant requests that the Court stay this case and delay resolution for an indeterminate time under the doctrine of primary jurisdiction.  This request should be denied.

The primary jurisdiction doctrine "does not require that all claims within an agency's purview be decided by the agency." *Brown v. MCI WorldCom Network Serv., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002). Nor is it intended "to secure expert advice for the courts from regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit." *Id.* (quoting *U.S. v. General Dynamics Corp.*, 828 F.2d 1356, 1365 (9th Cir. 2002)). Instead, primary jurisdiction is only properly invoked when a case pending in federal court "requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Brown*, 277 F.3d at 1172; *see also General Dynamics*, 828 F.2d at 1362 ("The doctrine applies when protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.").

"Primary jurisdiction is not implicated simply because a case presents a question, over which the FCC could have jurisdiction.  Rather, primary jurisdiction is properly invoked when a case presents a far-reaching question that 'requires expertise or uniformity in administration.'" *Brown*, 277 F.3d at 1172. Ultimately, the doctrine "applies in a limited set of circumstances," *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008), and "is to be invoked

sparingly, as it often results in added expense and delay." *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005).

In *Pimental v. Google, Inc.*, No. C–11–02585, 2012 WL 1458179 (N.D. Cal. Apr. 26, 2012), a defendant in a text message case under the TCPA requested a stay until final FCC action on a petition.  The court denied the motion stating as follows:

> After a review of the relevant factors, the Court declines to apply the doctrine of primary jurisdiction here. The issues concerned are ones either a court or an agency would be competent to decide. Indeed, Defendants do not dispute that the courts and the FCC have interpreted these terms in the past. Although Defendants contend that the issues are now directly in front of the FCC, the Court is not convinced that the FCC has agreed to issue a ruling, let alone issue a ruling on an expedited basis.

*Id.* at *3.  In so holding, the *Pimental* court determined that statutory interpretation of the term "automatic telephone dialing system" was not an issue of first impression.  Likewise, it is not an issue that that is particularly complicated and therefore best resolved by the FCC.  To the contrary, "a district court is suited to resolve [these] issues of statutory interpretation" as they are "matters safely within the conventional experience of judges."  *Id.* at *3.

The *Pimental* court also observed that "Congress has not placed this task [of interpreting ATDS] particularly within the agency's discretion." *Id.* at 4.  In addition, the court held that there was no danger of inconsistent rulings because the Court would be capable of reviewing any FCC guidance as it arises later in this litigation, such as at the class certification or summary judgment stage.  *Id.* at *4.

> [I]f the FCC actually is poised to rule on the issues, then the Court will not need to decide these issues. However, the parties need to conduct discovery to obtain the facts and expert opinions necessary, so that once these issues are decided by the FCC or the Court, the Court can apply the undisputed facts to the law on motion for summary judgment, or a jury can find those facts at a trial on the merits. A stay will not permit the parties to obtain the discovery necessary to resolve the factual disputes Defendants raise in their Answer and Affirmative Defenses.

*Id.* at *5.

Here, Defendant requests to stay this case based upon the possibility that, one day, the law may change regarding its liability for sending automated calls without the recipients' prior

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 23

Heyrich Kalish McGuigan pllc
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

express consent in violation of the TCPA. Defendant requests a stay in order to defer to the FCC even though elsewhere in its brief Defendant contends that FCC "rulings are unreasonable and not entitled to judicial deference." Motion at 11:13.

These issues have already been decided many times over by the FCC itself and by numerous courts, including this one. The weight of authority militates against entry of a stay where, as here, the pending FCC petitions seek to clarify an issue that is a purely legal and which does not involve agency expertise or experience.  Defendant's request for a stay should be denied.

## V.  CONCLUSION

Using an ATDS, Defendant injured Mr. Wright and numerous consumers like him by sending their cellular telephones many tens of thousands of text message advertisements in violation of the TCPA, CEMA, and CPA. Mr. Wright's complaint provides Defendant with sufficient notice of the factual bases for the claims alleged against it under both federal and state law. The inquiry into the adequacy of Mr. Wright's complaint should end there. Mr. Wright respectfully asks the Court to deny Defendant's motion to dismiss or to stay.

RESPECTFULLY SUBMITTED:  July 14, 2014.

HEYRICH KALISH MCGUIGAN PLLC
600 Stewart Street, Suite 901
Seattle, WA  98101
Tel: (206) 838-2504
Fax: (206) 838-2505

/s/ Donald W. Heyrich
Donald W. Heyrich, WSBA #23091
   dheyrich@hkm.com

STUTHEIT KALIN LLC
Peter Stutheit, WSBA #32090
2300 SW 1st Avenue, Suite 101
Portland, OR 97201
Tel: (503) 493-7488
Fax: (503) 715-5670
peter@stutheitkalin.com

Attorneys for Plaintiff

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS OR FOR STAY
(Case No. 2:14−cv−00421-MJP)
Page 24

HEYRICH KALISH MCGUIGAN PLLC
600 Stewart Street, Suite 901
Seattle, Washington  98101
(206) 838-2504

1

**CERTIFICATE OF SERVICE**

2

On July 14, 2014, I caused the foregoing document to be filed with the Clerk of the

3

United States District Court, Western District of Washington, using the ECF system, which will

4

cause a copy to be served on the following:

5

6

                Bradley S. Keller, WSBA #10665

7

                Chelsey L. Mam, WSBA #44609
                Byrnes Keller Cromwell LLP

8

                1000 Second Avenue, 38th Floor
                Seattle, WA 98104

9

                Telephone: (206) 622-2000
                Facsimile: (206) 622-2522

10

                Email:  bkeller@byrneskeller.com
                        cmam@byrneskeller.com

11

                Attorneys for Defendant Lyft, Inc.

12

13

14

15

                                    */s/ Donald W. Heyrich*
                                    Donald W. Heyrich, WSBA #23091

16

                                    HEYRICH KALISH MCGUIGAN PLLC
                                    600 Stewart Street, Suite 901

17

                                    Seattle, WA  98101
                                    Telephone: (206) 838-2504

18

                                    Facsimile: (206) 838-2505
                                    Email: dheyrich@hkm.com

19

20

21

22

23

24

25

26

27