1          UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF WASHINGTON
   _____
3
   KENNETH WRIGHT, on his own    )
4  behalf and on behalf of       )
   other similarly situated      )
5  persons,                      )
                                 )
6          Plaintiff,            )  No. 2:14-cv-00421
                                 )
7                                )
        vs.                      )  Seattle, WA
8                                )
   LYFT, INC., a Delaware        )
9  corporation,                  )
                                 )  Motion Hearing
10         Defendant.            )  December 16, 2014

11 _____

12          VERBATIM REPORT OF PROCEEDINGS
     BEFORE THE HONORABLE CHIEF JUDGE MARSHA J. PECHMAN
13            UNITED STATES DISTRICT COURT
   _____
14

15 APPEARANCES:

16 FOR THE PLAINTIFF:    DONALD W. HEYRICH
                         HKM Employment Attorneys PLLC
17                       600 Stewart Street, Suite 901
                         Seattle, WA 98101
18                       dheyrich@hkm.com

19                       JASON A. RITTEREISER
                         HKM Employment Attorneys PLLC
20                       600 Stewart Street, Suite 901
                         Seattle, WA 98101
21                       jrittereiser@hkm.com

22 FOR THE DEFENDANT:    CHELSEA LYN MAM
                         Gordon Tilden Thomas & Cordell LLP
23                       1001 Fourth Avenue, Suite 4000
                         Seattle, WA 98154
24                       cmam@gordontilden.com

25

```
 1                         BRADLEY S. KELLER
                           Byrnes Keller Cromwell LLP
 2                         1000 Second Avenue, 38th Floor
                           Seattle, WA 98104
 3                         bkeller@byrneskeller.com

 4

 5    Andrea Ramirez, CRR, RPR
      Official Court Reporter
 6    United States District Court
      Western District of Washington
 7    700 Stewart Street, Suite 17205
      Seattle, WA 98101
 8    andrea_ramirez@wawd.uscourts.gov

 9    Reported by stenotype, transcribed by computer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Wright v. Lyft, 12/16/14

```
 1            THE CLERK:  This is the matter of Kenneth Wright vs.
 2    Lyft, Cause Number C14-421.
 3       Counsel, please make your appearance.
 4            MR. HEYRICH:  May it please the Court, Donald
 5    Heyrich, for plaintiff, and with me is Jason Rittereiser from
 6    my firm.
 7            THE COURT:  Good afternoon.
 8            MR. KELLER:  Good afternoon, Your Honor.  Brad
 9    Keller, on behalf of defendant Lyft.  And with me also is
10    Chelsea Mam.
11            THE COURT:  Good afternoon.
12       Well, Counsel, I've had an opportunity to read your
13    paperwork, and you should have received a series of questions
14    from me yesterday.  I'd like to have you respond to those
15    sometime during the course of your arguments.
16       It's my understanding that you've been given 20 minutes
17    per side; is that correct?
18            MR. KELLER:  Correct.
19            THE COURT:  All right.  Then let's begin.
20            MR. KELLER:  Thank you, Your Honor.  Brad Keller, on
21    behalf of Lyft.  And I'm going to dive right into this.
22       The Court posed what is the 64-dollar question regarding
23    the TCPA claim.  I'm going to address the federal TCPA claim,
24    and Ms. Mam is going to address the state law claims.  I'm
25    going to throw around a bunch of acronyms here.  I'm going to
```

Wright v. Lyft, 12/16/14

```
 1 | feel like I'm in the Army again, I think.
 2 |       As I waded through the multiple conflicting district court
 3 | decisions addressing exactly the issue you posed, what is the
 4 | definition, it reminded me a little bit of a very time-worn
 5 | joke about accountants:  How much is one and one?  And the
 6 | answer being:  What do you want it to be?  Because you can find
 7 | the district court decision to justify a definition of an
 8 | automated telephone dialing system to justify the outcome that
 9 | Lyft is asking you to reach in this case, or to justify the
10 | definition that the plaintiffs ask for.
11 |       The parties are advocating, essentially, two different
12 | interpretations -- or excuse me -- two different definitions.
13 | And perhaps predictably, under Lyft's definition, we should win
14 | this motion under the TCPA.  Under plaintiff's proffered
15 | definition, Lyft contends it should also win.  But it is
16 | admittedly a closer call in the context of the Rule 12 motion.
17 |       The two definitions I've handed up -- I asked the clerk to
18 | hand up to you a handout.  And if you have that in front of
19 | you, it's got the two definitions that the parties are
20 | proposing.  I'm not going to read them.  The difference between
21 | the two of them is essentially whether or not a required
22 | feature is automated, random, or sequential dialing.  That's
23 | exactly what the statute says.  That's what we're advocating.
24 | And that is what you will not find in the definition of -- that
25 | the FCC came up with in the context of a predictive dialer.
```

Wright v. Lyft, 12/16/14

```
1       There's really a handful of district court cases that we
2   would urge you to consider for guidance in this issue.  One is
3   the Dominguez vs. Yahoo case, out of the Eastern District of
4   Pennsylvania, decided in March of this year, where the Court
5   rejected the FCC's interpretation and conducted a Chevron
6   analysis to basically say, the statute is unambiguous.  It has
7   a definition and includes an automated random or sequential
8   dialer, end of story.
9       Also, the Marks vs. Crunch San Diego case, which was from
10  October of this year, from the Southern District of California,
11  Judge Cynthia Bashant.  She also rejected the FCC's effort to
12  rewrite the statute and said:  Even if I did consider that to
13  be binding, under Hobbs Act issues, I find that the FCC was
14  dealing with predictive dialers.  It wasn't dealing with the
15  issue confronted in the TCPA claim.
16      On the other end of the spectrum is the very recent
17  Johnson vs. Yahoo case from the Northern District of Illinois,
18  decided last week, where, interestingly, the district court
19  judge there agreed that the FCC interpretation was off the
20  reservation.  It wasn't grounded in the statute at all; and if
21  the Court was going to go that route, that it would say it
22  conflicts with it.  But that court, which sits in the Seventh
23  Circuit, felt it was bound under a Seventh Circuit decision,
24  such that the Hobbs Act precluded it from in effect rejecting
25  what was an unauthorized FCC interpretation.
```

Wright v. Lyft, 12/16/14

```
 1         And the last case I'd urge you to take a quick look at is
 2    another case from the Northern District of California decided
 3    last month, Nunes vs. Twitter.  Because there is just a good
 4    summary of essentially the three -- the disparity in the
 5    arguments here.  And although the Court denied the Rule 12
 6    motion, it did so in that case because it basically held that
 7    Twitter hadn't really raised the issue in its briefs that the
 8    FCC was off the reservation and unauthorized to come up with
 9    its interpretation.  They have raised it for the first time in
10    argument and said, basically, come back and argue that at
11    summary judgment time.
12         So why -- I should just briefly address for you why it is
13    that the FCC rewrite of the statute should not be applied here.
14    Probably the biggest reason is, the statute says what it says,
15    and it's absolutely clear in the statutory definition.  Random
16    or sequential dialing is an element of an automated dialer.
17         Secondly, under a Chevron analysis, there is no basis for
18    giving the FCC rewrite of the statute any deference whatsoever
19    here.
20         And if you don't apply a Chevron analysis, the third
21    reason is that the FCC rule-making proceeding back in 2003,
22    that led to this contrary definition, was all about predictive
23    dialers.  And the Hobbs Act does not come into play, because we
24    are not asking you to enjoin, or to set aside, or suspend, or
25    invalidate any FCC ruling regarding predictive dialers.
```

Wright v. Lyft, 12/16/14

```
1          THE COURT:  Mr. Keller, you're arguing somewhat two
2    ways.  I mean, you're basically saying:  Don't listen to the
3    FCC.  And then in the alternative, you want me to wait for the
4    FCC to speak on this issue.
5          MR. KELLER:  That's true.  I am trying to cover this
6    six ways -- both ways.
7          THE COURT:  All right.  You want belt and suspenders
8    on it.
9          MR. KELLER:  Well, I'm a realist.  And I'm a realist
10   in the sense that -- while there is an emerging -- I don't want
11   to say emerging trend -- well, a number of very recent district
12   court decisions have said:  The FCC is entitled to no deference
13   on this.  If you apply a Chevron analysis, it's contrary to the
14   statute.  That's our primary argument.  But I'm also a realist
15   that there is a very unsettled body of law here, and there is a
16   very unsettled issue; and that if I'm right, and that the
17   predictive dialer issue is what they were grappling with, and
18   the FCC is going to fix that in the next couple of months, it
19   does make sense to give them that opportunity to do so.
20         THE COURT:  Do you know where that -- those cases are
21   with the FCC right now?
22         MR. KELLER:  I do.  And as with many things involving
23   our federal agencies, it's less -- I wish I had more clarity.
24      Regarding the Glide Talk, the general rule is that these
25   things take around 12 to 14 months from the closure of the
```

Wright v. Lyft, 12/16/14

1    comment period.  If the general rule applies, the Glide Talk

2    decision should be coming out in the first three to four months

3    of 2015.  And if the general rule ends up applying in this case

4    in the TextMe, we should have a decision from the FCC in

5    mid-2015.

6        And both of those -- both of those things, they do tee up

7    in front of the FCC, among other things, the issue of, does the

8    equipment actually have to be doing the prohibited function of

9    automated or random dialing, or is it enough that you could

10   reprogram the software such that it could do it?  It also tees

11   up the whole issue of when you have this invite-a-friend issue

12   that is so important in the Lyft application, is that

13   considered the user making the call, or is that the application

14   provider?

15           THE COURT:  One of the questions that I'm going to

16   ask your opponents -- and maybe I should give you a shot at

17   answering it -- is, how is this any different than somebody

18   saying:  Hey, I saw that Macy's has a coupon for such-and-such,

19   and you forward it on to your friend?

20           MR. KELLER:  It's the same thing in terms of the user

21   doing it.  The scale can be different.  And because I can send

22   it on to -- that one coupon, I can only send it to one coupon.

23   Here, I can send that coupon on to two or three or ten.  And

24   when this application was initially launched, I could send it

25   to all of my contacts.  That feature was disabled after a few

Wright v. Lyft, 12/16/14

```
 1   months, and it's no longer there.  But for purposes of the
 2   motion to dismiss, we have to cover both scenarios.
 3       We would say it's very similar.  And that really is the
 4   alternative, in somewhat the alternative basis, is, regardless
 5   of whether the FCC definition is used or not, we say even if
 6   you use it, the degree of human intervention that's involved in
 7   how you use this app -- and I'm not going to go through them,
 8   but those are the rest of the pages in the handout that I
 9   provided -- is all of the multiple, user-taken individual steps
10   that a human being has to take before an invitation goes out to
11   your friend.
12           THE COURT:  Let's assume, for purposes of argument,
13   that I agree with you on your federal claim, and you don't have
14   one.  Should I reach the other two or send the plaintiffs back
15   to state court?
16           MR. KELLER:  I would always rather be in federal
17   court in a consumer class action, even if it's under CEMA or
18   under the CPA.  I would have a personal preference of staying
19   in federal court and having the claims addressed here, either
20   in promotions or on the merits at trial.  But I recognize that
21   it is entirely discretionary with this court as to whether it
22   wants to continue to exercise pending jurisdiction.  And in a
23   certain sense, I acknowledge that's a lot to ask.  But that
24   would be my ask.
25           Thank you, Your Honor.
```

Wright v. Lyft, 12/16/14

1           THE COURT:  I have one more question for you.  And

2    that is, I'm trying to understand what the damages would be

3    here, you know, infinitesimal, if somebody gets a single text

4    message.  I mean, that must be less than a penny.

5           If there's no unit of measure, can there be damages?  I

6    know that the state supreme court has talked about you have

7    damages under the CPA even if they're miniscule.

8           But under the federal statute, if you can't measure the

9    damages, are you damaged?  Or am I missing what the damage

10   might be?

11          MR. KELLER:  I think you're missing the debate.  And

12   I view myself to be an advocate and also to try and be an aid.

13   And there would be a debate between the plaintiff and the

14   defendant about whether there is any damage requirement at all

15   under this statute.  We will argue to you that there is and

16   that it is not formulaic.  My opponent will argue to you at a

17   later -- if we ever get to that stage of the case -- that, no,

18   there is no such requirement, it's automatic, formulaic, $500

19   per text, even if it's a million texts that got sent.  That is

20   a debate and an unanswered issue.  As an advocate, I would be

21   pushing what you were perhaps suggesting in your comment.  But

22   I have to acknowledge it's uncharted --

23          THE COURT:  Thank you.

24          MR. KELLER:  -- under the federal statute.

25          Ms. Mam is going to address the injury issue under the

Wright v. Lyft, 12/16/14

```
1    state law.

2              THE COURT:  Okay.

3              MS. MAM:  Good afternoon, Your Honor.  Chelsea Mam,

4    on behalf of Lyft.

5              THE COURT:  Good afternoon.

6              MS. MAM:  I'm going to talk about why plaintiff's

7    state law claims can and should be dismissed.  Primarily, I'm

8    going to focus on the commercial mailing -- or Commercial

9    Electronic Mailing Act, or CEMA.  And under that act, there are

10   three primary issues why Lyft -- why plaintiff's claims should

11   be dismissed.

12        First, the plain language of the statute does not grant

13   plaintiff a private cause of action for damages.  Second,

14   plaintiff has not alleged the necessary injury to maintain a

15   private cause of action for damages or injunctive relief.  And

16   third, even if the plaintiff could maintain a private cause of

17   action despite the plain language of the statute, plaintiff has

18   failed to allege a violation of CEMA, because the text message

19   at issue here is not commercial.

20        Turning to that first issue of whether plaintiff can

21   maintain a private cause of action for damages, we need only

22   look at the plain language of the statute.  Section 090,

23   Subsection 1, says that a person can bring a private cause of

24   action for any violation of this entire chapter and may seek

25   injunctive or damage relief.  However, the very next sentence
```

Wright v. Lyft, 12/16/14

1    expressly limits damages relief to causes of action for a

2    phishing scheme.

3          Phishing schemes are e-mails that are sent for the purpose

4    of deceiving the recipient into providing personal information,

5    and then turning around and using that for identity theft or

6    other fraud.  Plaintiff hasn't alleged, nor could he allege, a

7    phishing scheme here.  And therefore, he can't make a claim

8    under CEMA for damages.

9          To address the Court's question on this issue of what

10   "subsection" is referring to and means in this context, Lyft

11   asserts that it should be read as any other statute, any other

12   RCW.  The chapter is CEMA itself.  Then there's Section 090 and

13   Subsection 1.  And when Subsection 1 refers to "this

14   subsection," it's referring to Section 1 of 090, not

15   Section 080 or Subsection zero -- some subsection in 080 or

16   040, for example.  The legislature knows how to make a private

17   cause of action and did so here.  And it also limited that

18   cause of action for damages to phishing schemes, which

19   plaintiff simply has not alleged.

20         Furthermore, plaintiff can't bring a CEMA action here

21   because -- for damages or injunctive relief, because he hasn't

22   asserted a sufficient injury.  As the Court has pointed out

23   here, there needs to be some sort of threshold injury to make a

24   claim, and Section 090 requires that.  It says:  Any person who

25   is injured can bring a private cause of action.  But the

Wright v. Lyft, 12/16/14

1    plaintiff hasn't been injured.  There's de minimis, if any,

2    injury here.  It's like saying:  I was standing in the lobby

3    today and pressed the button for an elevator, and it didn't

4    come for 15 seconds.  That was so aggravating.  I should be

5    able to bring a claim against the people who made the elevator,

6    or the building that I work in.

7        Similarly, the plaintiff says:  I received a text message.

8    It took about two seconds to process it, could delete it

9    immediately, and now I should be able to claim damages and loss

10   here.  It just simply doesn't add up to an injury sufficient

11   under CEMA.

12       Finally, even if the plaintiff could bring a CEMA claim,

13   under the 090 private cause of action, he's failed to allege

14   that there's been a violation of CEMA, because the text message

15   is not commercial in nature.

16           THE COURT:  Let me ask you a question about that.

17           MS. MAM:  Okay.

18           THE COURT:  What's the point of offering this up if

19   it isn't to make money somehow or further their business?  In

20   other words, there's no point in doing any of this unless

21   there's a commercial nature.  They didn't do this to be nice.

22       So how is it not commercial?

23           MS. MAM:  So I agree that the ultimate goal in the

24   future is to bring in Lyft community members.  But I think we

25   need to do as the Court did in *Hickey vs. Voxernet* and limit

Wright v. Lyft, 12/16/14

1    the analysis to this text message.  This text message is not

2    seeking an exchange of money between the plaintiff and Lyft.

3    It's not seeking an immediate, right-now sale, as the Court has

4    defined it.

5          THE COURT:  So does "commercial" mean that there has

6    to be an immediate -- an immediate exchange?  Because companies

7    all over the world give things away in the hopes that if you

8    get somebody to try something, they will come back and be a

9    patron.

10         MS. MAM:  Sure.  However, the statute has defined

11   commercial as messages sent to promote goods or services for

12   sale.  And then as this court recognized, definition of sale is

13   a price in money paid or promised.  Here there's no money paid

14   or promised except for a free giveaway, the second component of

15   the statute.  But it simply doesn't meet that immediate need

16   for a sale in the text message.  I think the distinction is

17   potential future sales versus current sales.  And I think that

18   the Court recognized in *Hickey vs. Voxernet* that the logical

19   way to view that is current -- what's the current text message

20   proposing?  Is it a current sale, or is it looking into the

21   future and hoping for something?

22         THE COURT:  So Congress didn't want to preclude

23   people from getting free stuff --

24         MS. MAM:  Exactly.

25         THE COURT:  -- but they do want to stop them from

Wright v. Lyft, 12/16/14

```
1   being solicited.

2            MS. MAM:  Right.  And just briefly, we want to

3   reiterate that the CPA claim can be dismissed, because it's

4   derivative of the CEMA claim.  And since we assert that the

5   CEMA claim fails, the CPA claim necessarily fails as well.

6   Thank you.

7            THE COURT:  Thank you.

8            MR. HEYRICH:  Good afternoon again, Your Honor.

9   Donald Heyrich for the plaintiff.

10       These issues are fascinating.  It's our pleasure to be

11  discussing them with you here today.

12       And I guess I'll address the Telephone Communication

13  Protection Act first, which -- since that was the Court's first

14  question.  And the question is, how should the Court define

15  ATDS.  We submit that the Court should -- first of all, we have

16  to recognize we're in a Rule 12 setting.  Based on the facts

17  that are alleged in the complaint, we're not aware of any case

18  anywhere across America that said that these kinds of facts

19  don't get past the Rule 12 threshold.  Even Judge Lasnik, in

20  the *Orange Cab* case, where on summary judgment, after experts

21  had an ability to look at the information and the systems being

22  used, and manuals were submitted and so forth, that's the point

23  at which Judge Lasnik was able to make an informed decision.

24  We, obviously, respectfully disagree with the decision that was

25  reached, and we've preserved it for appeal.
```

Wright v. Lyft, 12/16/14

```
 1        But the Crunch case and the other case that was mentioned
 2   here today, they're all summary judgment cases.  And it does
 3   seem to us that what's happening here a little bit is, all the
 4   inferences are being taken against the plaintiff when, in fact,
 5   in a Rule 12 setting here, we need to do just the opposite.
 6        And there really are two answers to your question here.
 7   One is, we have a point of view as to this definition and how
 8   it should be read and applied.  But notwithstanding that, we
 9   would submit that no matter how the Court defines automatic
10   telephone dialing system, under any standard that's out there,
11   even a narrow view of the statute, the only thing we need to
12   do, at this point, is to point out that it is plausible that an
13   automatic telephone dialing system was used.  And it's
14   important to look at, as the allegations in the complaint
15   state, this is -- this is one of the most sophisticated
16   technology companies in all of America that's created an
17   application that can find a car nearby, give you pictures of
18   the driver, give you the reviews, tell you how long it's going
19   to get there, set you up with a ride, charge you, pay the
20   driver, take a profit.  And they've worked into their
21   application this system that essentially extracts data from a
22   user's telephone.
23        And then that -- there's absolutely no reason to doubt
24   that it's plausible that this system has a sequential dialing
25   capability in there that will be shown upon discovery.  And
```

Wright v. Lyft, 12/16/14

```
 1    that's all we need, is that it has to be plausible.  The
 2    definition is:  Equipment that has the capacity to store or
 3    produce telephone numbers to be called, using a random or
 4    sequential number generator.  We submit that no matter how
 5    those words are applied, it's plausible that any of those
 6    applications apply to the facts of this case in light of the
 7    intense and immense sophistication that we have in this system
 8    that's being deployed by Lyft.
 9          Nevertheless, we're in the Ninth Circuit, and Satterfield
10    does tell us that equipment that has the ability to use an
11    electronic database to send text messages is equipment that has
12    the capacity required by the statute.  And, of course, the FCC
13    has reached a similar conclusion.  The reasoning about
14    predictive dialers -- that term has been used quite a bit -- is
15    not based upon predicting when the phone should ring.  It's
16    based upon the fact that computers, by their very nature,
17    operate from a database.  And by their very nature, they store
18    the data in a list, and the processer sequentially processes
19    one record at a time and goes through it.
20              THE COURT:  Tell me how this is different than I see
21    a coupon for Macy's, and I know my friend is looking for
22    something, and I forward it on.
23          Isn't it the same thing as me hitting the "forward" button
24    on my computer, and the message comes up on my friend's
25    computer?  Because this --
```

Wright v. Lyft, 12/16/14

```
1              MR. HEYRICH:  Yes.

2              THE COURT:  You've got to have a contact here who

3      says:  Yes, I want you to contact Joe.

4              MR. HEYRICH:  Right.  Yes.

5              THE COURT:  In other words, this -- this dialer

6      doesn't scrub data from a participant's phone without somebody

7      saying:  Yes, you can have it.

8              MR. HEYRICH:  It will not surprise the Court that we

9      think there are significant differences.

10          For one, we believe that what the user, or the person

11     who's in your scenario forwarding to a friend, the only thing

12     in our -- in the Lyft situation that the user is doing is

13     acquiescing to -- and the difference, too, is, Lyft is paying

14     consideration to obtain that data.  And the law has never been,

15     and hopefully it never will be, that one can go out and

16     purchase data and spam those people.  Otherwise, it would be an

17     end run around the TCPA, and machines would be causing

18     intrusions into everyday life all over the place.

19          But the difference here is, in your scenario, that person

20     with the coupon is sending that to a friend.  Here, Lyft is

21     taking the data.  Lyft is processing the data.  Lyft is

22     organizing the data.  Lyft even inserts the boilerplate

23     promotional message.  There's no indication that this "Jo Ann

24     C." inserted any of the words that were in this promotional

25     message.  We think that's very important.  There were screen
```

Wright v. Lyft, 12/16/14

1   shots of the app, and it will be noticed that there's nowhere

2   in there where it's suggested that you can send a personalized

3   message.

4        So what we have is, really, it's an organized, wide-scale

5   promotional campaign, where Lyft has said:  Give us your data.

6   We'll pay you.  And then that -- those messages are processed

7   through the pipes, the routers, the servers, and everything

8   that Lyft has set up to automate this text messaging.

9        And under the law, it's not forwarding data that creates a

10  claim, so it's not the user sending data to Lyft that creates a

11  claim.  It's Lyft making a telephone call.  And we would submit

12  that this really is the same thing as Lyft -- you know, in a

13  different scenario, it could be a voice call where someone

14  calls and says:  Hey, your friend Jason thinks that you may

15  want to use Lyft.  Are you interested?  I think any person

16  would recognize that as run-of-the-mill telephone solicitation.

17  And that's exactly what we're talking about here.  We're

18  talking about machine-based, processor-based intrusions into

19  our private lives.  And to allow this kind of system to exist,

20  it's exactly what the TCPA was designed to prevent.

21       And that's really -- you know, the FCC has the experts in

22  telephone technology.  And really, the grounding of the FCC

23  decisions is in looking at these technologies.  And what

24  they've said is, by their nature, those technologies have the

25  capacity to store telephone numbers and to sequentially dial

Wright v. Lyft, 12/16/14

1    telephone numbers.

2         But as I said, regardless of what definition the Court

3    were to apply, under the Rule 12 standard, it certainly is

4    plausible that this system has the capability to sequentially

5    dial or to -- you know, 001, 002, whatever.  And some of the

6    courts have gotten into, you know, whether there needs --

7    whether it can be an ATDS if there's substantial modification

8    and so forth.  There are a lot of issues that really can't be

9    decided without us having an opportunity for our expert to take

10   a look at their system and to really see what it does.

11        And we would submit, too, that, you know, as a consumer

12   protection statute, it's -- the Courts have said it is

13   appropriate to construe these definitions broadly to protect

14   consumers, rather than the other way around.

15             THE COURT:  Well, what are we protecting from here?

16   I mean, it's a -- if you decide you're going to carry around an

17   iPhone, haven't you said, "Yeah, bother me"?  Because the world

18   can now bother you.  You don't want to be bothered, you turn it

19   off.  But we get text messages all the time.  And you don't

20   have to open it up, and you don't have to respond.

21        So where is the harm?

22             MR. HEYRICH:  Well, Congress has decided that it's an

23   intrusion.  It's an invasion of privacy.  It makes our devices

24   less useable, because we have to wade through the junk to get

25   to the good stuff.

Wright v. Lyft, 12/16/14

```
 1          And if you look at -- if you look at e-mail spam, for
 2     example, where the law does not have the same teeth that the
 3     ATDS has, businesses across America spend millions and millions
 4     of dollars on spam filtering software so that when I sit down
 5     at my desk, I don't have 8,000 spam messages from, you know,
 6     someone who wants to send me money from Somalia or something.
 7     And that's really the harm.  The only thing that's keeping our
 8     telephones free from that kind of incessant spam is this law.
 9     And Congress has decided that this is the same as limiting
10     telemarketing calling late at night, or early in the morning,
11     or calling over and over again with improper sales calls.
12     We're in that same area.
13          So really we're -- technology is all around us.
14     Technology is programmable, and technology is programmable to
15     intrude into our lives at any given time.  Sure, you can turn
16     your phone off, but it's an important business tool that we all
17     need, or we need to communicate with our kids, our family, you
18     know, the office, whoever it is.  So that's really the harm.
19     It's keeping our telephones free of these unauthorized
20     intrusions that Congress said are inappropriate.
21          So I think it's important -- again, on Rule 12, it has to
22     be plausible.  We've alleged, we believe, enough facts to get
23     by Rule 12.  And I am not aware of any case that says we don't.
24     And it's not the transferring of data.  It's Lyft that's
25     actually making the call.
```

Wright v. Lyft, 12/16/14

1    And finally, I guess the -- you know, the other important

2    consideration here is that, you know, we're at the pleading

3    stage.  Of course, they're not going to let us look at their

4    system until we have the Court's okay to do that.  And it

5    certainly seems to defy some fundamental due process rights for

6    any plaintiff who could never ever allege facts to meet the

7    definition in the TCPA with certainty without being able to

8    look at what's there.  And that's why I think the Rule 12

9    standard is so lenient.

10    We submit that it would be more appropriate for the Court

11    to make an informed decision after we've had experts who can

12    look at the system and analyze the equipment.

13        THE COURT:  Well, surely you wouldn't have brought

14    the lawsuit without doing an investigation that you believe

15    that you have cause of action here.

16        MR. HEYRICH:  That's correct.  We do.

17        THE COURT:  And I'm surprised.  You must be one of

18    the few lawyers that's ever argued to me that 12(b) is a

19    liberal standard.  *Twombly* is pretty strict, and has gotten

20    more strict in terms of how much you have to plead in order to

21    get through.  More and more cases are bringing 12(b) in order

22    to weed out those things that aren't really going to make it.

23    So I'm a little surprised by your statement.

24        MR. HEYRICH:  Well, in any TCPA case, a plaintiff --

25    sure, we can do a lot of investigating.  We piece together a

Wright v. Lyft, 12/16/14

```
 1   lot of facts.  We believe it is an automatic telephone dialing
 2   system.  But, you know, we're not here on summary judgment, and
 3   we haven't had a chance to take depositions.  We haven't had a
 4   chance to look at the system itself.  And in this scenario,
 5   what the courts have said is, it just needs to be plausible
 6   that the defendants have used an automatic telephone dialing
 7   system.
 8           THE COURT:  Do I remember accurately that you filed
 9   your lawsuit four days after the message?  Am I incorrect on
10   that?
11           MR. HEYRICH:  I don't recall the timeline, but I
12   also -- I'm not certain.  I'm sorry.  I can't answer that.
13       I will say that we've been criticized in the past for
14   waiting too long.  Because if a defendant is sending large
15   amounts of text messages, they prefer to know -- text messages
16   that violate the law, they prefer to know sooner rather than
17   later.
18           THE COURT:  Thank you.
19           MR. HEYRICH:  Unless the Court has more questions on
20   ATDS, I'll turn to state law.
21           THE COURT:  Go ahead.
22           MR. HEYRICH:  So the question asked by the Court is:
23   What does the word "subsection" mean in Section 19.190.090?
24   And the answer to that, we submit, is clear from the context in
25   that the subsection refers to the information that follows in
```

Wright v. Lyft, 12/16/14

1     that subsection, in 090, which essentially is a section dealing
2     with lawsuits for phishing; that is, someone who misrepresents
3     who they are in order to get someone to click and give their
4     account information, like if I pretend I'm Bank of America,
5     give me your information quickly.  But so that is -- if someone
6     is seeking damages under 090 for a violation of 080, then those
7     damages lie against the person who's engaged in phishing.  But
8     that in no way repeals or abrogates the damages that are
9     available under Section 040.  And those sections provide $500
10    in damages for a commercial electronic e-mail -- and that's a
11    right that's existed since 1998 -- and for a commercial
12    electronic text message, which is a right that's existed since
13    2003.
14         And I don't want to spend a lot of time going through the
15    legislative history, but it is extremely important.  And if it
16    would assist the Court, I have a copy of the four session laws.
17         We've got a statute that's been affected by four separate
18    enactments of the Washington state legislature.  The first was
19    the 1998 Electronic Mail Act.  And that's where the state
20    legislature called it an invasion of privacy and talked about
21    the problem with this kind of spam is that it reduces the
22    usability of one's own e-mail, because you have to wade through
23    the unwanted messages to get to the ones that you actually want
24    to use.  And that statute created five sections, 010 through
25    050.  And 040 is important, because that is the section that

Wright v. Lyft, 12/16/14

1    establishes damages to the recipient of a commercial electronic

2    mail message today.

3         In 2003, the legislature came along and added 060 and 070

4    and amended the definition of illegal conduct to include

5    commercial electronic text messages.  And the statute that

6    we're talking about here, in 090, came along two years later in

7    the E-mail Fraud Act.  And what's interesting, if you look at

8    the session laws, it will show you what the legislature

9    changed.  They added some words, they removed words, and they

10   added 080 and 090 and the two follow-on sections about the

11   importance to public policy and so forth.

12        They never touched 040.  The legislature knew, since 1998,

13   that that cause of action existed for electronic mail.  They

14   knew since 2003 the cause of action applied for commercial text

15   messages.  So it just makes no sense at all that in 090 -- that

16   they come along in 2005, insert 090, and have somehow repealed

17   or completely abrogated the rights that previously have

18   existed.  And the Washington courts certainly would not find

19   that to be a direct repeal of those rights by implication.  So

20   to this day, 040 provides that:  Damages to the recipient of a

21   commercial electronic mail message or a commercial electronic

22   text message sent in violation of this chapter are $500 or

23   actual damages, whichever is greater.

24        So the statute has continued to provide for damages.  To

25   find now that there's no private cause of action would mean

Wright v. Lyft, 12/16/14

```
 1    that the legislature left in place a right without any remedy.
 2    And as the Frias case and the O.S.T. case recently has shown,
 3    the legislature -- the state courts do not find that the
 4    legislature will impliedly repeal rights that were well known
 5    and in existence.  You know, if they wanted to get rid of it
 6    when they applied 090, they would have.  But they left it in
 7    place.  And there's no indication that the legislature intended
 8    to repeal it.  And the Washington Supreme Court, in the O.S.T.
 9    case, as recently as two or three months ago, said that the
10    Court should enforce any statute like this unless there's no
11    conceivable way to harmonize and apply both of them.
12         And we submit -- you know, what's interesting is, one of
13    the flaws, we think, in the reasoning is that the Defendant is
14    relying on the second sentence of 090(1), which talks about
15    subsection.  But the first sentence of that talks about "a
16    claimant may," may sue under 090.  That doesn't mean that the
17    plaintiff must sue under 090, because 040 is an alternative
18    remedy that exists under the statute.
19         And what the courts in Washington also have said when
20    interpreting Washington law is, in that kind of a situation,
21    where you've got a general statute, like 090, that follows on a
22    specific one, like 040, which applies to text messages and
23    e-mail, that the four -- the preexisting statute continues to
24    survive as an exception to the general rule.  And that's one of
25    the holdings in the O.S.T. case.
```

1    So to circle back to the Court's question here, we think

2  what "subsection" means is that someone can sue under 190 for

3  violation of the obligations in 080.  But that does not mean

4  that the clear language in Section 040 is meaningless and has

5  been repealed.

6    Finally, it bears noting that these are important rights

7  for Washington consumers, as reflected in the legislative

8  intent in terms of what the legislature was concerned about.

9  We submit that it's clear that 040 continues to survive and

10  provide a claim.  But if the Court has doubts, it certainly

11  seems like an important enough issue where, you know, perhaps

12  the Washington Supreme Court could be consulted on something

13  like this, as the Court -- as Your Honor did in the *Frias* case

14  not too long ago.

15    And I wasn't planning on addressing whether there was a

16  promotion of goods or services for purposes of the state CEMA

17  claim, as it was not among the list of questions.  You know,

18  but I guess I will say that Lyft is calling this an offer for

19  something free.  Historically for consumers, offers for things

20  that are free often end up not really being so free.  And in

21  here, a consumer is required to give them a credit card, is

22  required to agree on a long-term -- long, lengthy terms of

23  service in order to sign up and use that.  And frankly, you

24  know, whether it was commercial and it was promotional, that's

25  the kind of thing that we believe we should be entitled to

Wright v. Lyft, 12/16/14

```
 1    discovery.  I suspect that they've earned quite a tidy profit
 2    from these promotional text messages that they sent out.
 3         I guess, finally, I should address the FCC timing.  And
 4    we've -- after receiving the Court's question, we did go back
 5    and review the request for comment and the petitions that the
 6    FCC has been considering.  We haven't discerned any pattern
 7    that gives us any level of confidence as to when those would be
 8    decided.  I would say that -- if ever, actually.  There are a
 9    number that the FCC just never bothers to rule on at all.
10         And we would submit that if this case proceeds according
11    to the normal course, on a typical time frame, by the time
12    we're ready for dispositive motions or trial, the FCC either
13    will have ruled or never will rule.  And so from that
14    standpoint, it doesn't seem wise to wait for the FCC in this
15    situation.
16         With that, I'm happy to answer any additional questions,
17    Your Honor.
18              THE COURT:  Thank you, no.
19              MR. KELLER:  Do we have any time left?
20              THE COURT:  You've got about three minutes or so.
21              MR. KELLER:  The definition of an automated dialer
22    doesn't change whether it's a Rule 12 motion or a Rule 56
23    motion.  Once you figure out what the definition is that you're
24    going to use, you apply it in either context.
25         Counsel says is it plausible that an ATDS was used here.
```

Wright v. Lyft, 12/16/14

```
1    There is no allegation in this complaint that we have
2    automated, random, or sequential dialing.  There's no
3    allegation that it does that.  He says:  Well, what about
4    capability?  Maybe you could rejigger the system.  Maybe you
5    could send in an army of software engineers, or a sub-army, and
6    get it to do that.  I had my iPhone over there.  I used it for
7    the timer.  You get enough software engineers, that thing is
8    going to become an automated telephone dialing system.  And, in
9    fact, I think that's what Judge Lasnik ultimately concluded.
10   That's why you can't look at, if you put all this work into it
11   and reconfigure it, can you give it that capability in the
12   future, as much as, what is it doing right now?  How are you
13   using it?  In fact, that very issue is one of the issues that
14   is teed up in both the TextMe case and the Glide Talk petitions
15   in front of the FCC.
16        I want to just point out, if we were to stay this
17   proceeding until mid-June, June 30 of next year, we would have
18   a likelihood of having a resolution in TextMe, a likelihood of
19   resolution in Glide Talk.  There has also been an appeal that
20   was filed to the Ninth Circuit from Judge Bashant's decision in
21   Marks vs. Crunch San Diego which squarely deals with these
22   issues.
23             THE COURT:  They're not that fast, though.
24             MR. KELLER:  They're not as fast as June 30.  That's
25   true.
```

Wright v. Lyft, 12/16/14

```
 1        And I got a little bit of a kick out of the supplemental
 2   authorities that Mr. Heyrich filed.  I've never seen so many
 3   supplemental authorities.  It just reinforced for me what a
 4   moving playing field we're dealing on here.  If he can come
 5   up -- and we all could come up with so many potentially
 6   significant district court decisions just in the three months
 7   since the briefing period closed here.  This is a really
 8   shifting playing field and one that if the Court is not
 9   inclined to dismiss the whole case, hopefully we would get a
10   lot more guidance as to what some of these applicable rules
11   are, if we were to stay this for a period of through June 30
12   and require the parties to report at that time.
13        Thank you, Your Honor.
14             THE COURT:  Thank you.
15        Counsel, I'll write for you on this topic.  But I normally
16   have a turnaround time of about ten days, but I don't think I
17   can make it.  So if you don't see it by Friday, you're not
18   going to see it until after the first of the year, the first
19   week of January.
20             MR. KELLER:  By Friday of next week?
21             THE COURT:  Friday of next week; okay?
22             MR. KELLER:  So if we don't see it by Friday, it will
23   be after the first of year.
24             THE COURT:  Actually, no.  What I meant was, if you
25   don't see it by this Friday, you won't see it until after the
```

Wright v. Lyft, 12/16/14

```
 1   first of the year.
 2           MR. KELLER:  Great.
 3           MR. HEYRICH:  Okay.
 4           THE COURT:  All right.  Thank you very much for your
 5   arguments.
 6           MR. HEYRICH:  Thank you, Your Honor.
 7                       (Adjourned)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Wright v. Lyft, 12/16/14

```
1
2
3                    C E R T I F I C A T E
4
5
6
7         I, Andrea Ramirez, RPR, CRR, Court Reporter for the
8   United States District Court in the Western District of
9   Washington at Seattle, do hereby certify that I was present in
10  court during the foregoing matter and reported said proceedings
11  stenographically.
12         I further certify that thereafter, I have caused said
13  stenographic notes to be transcribed under my direction and
14  that the foregoing pages are a true and accurate transcription
15  to the best of my ability.
16
17
18         Dated this 2nd day of November, 2015.
19
20                         /s/ Andrea Ramirez
21                         Andrea Ramirez
                           Official Court Reporter
22
23
24
25
```