1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable Marsha J. Pechman

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

KENNETH WRIGHT, on his own behalf and on
behalf of other similarly situated persons,

                                        Plaintiff,

            v.

LYFT, INC., a Delaware corporation,

                                        Defendant.

NO. 2:14-cv-00421MJP

**DEFENDANT'S RENEWED MOTION
TO DISMISS**

NOTE ON MOTION CALENDAR:
DECEMBER 11, 2015

## I.      <u>INTRODUCTION</u>

Since this Court stayed this case to await the outcome of petitions pending before the

FCC, the law governing the Telephone Consumer Protection Act (TCPA) has developed

dramatically in Lyft's favor. The new guidance contained in the FCC's ruling[1] and subsequent

judicial decisions applying its principles all point in a single direction: Wright's TCPA claim

fails as a matter of law. Under the TCPA, only a party that (1) "make[s]" a call (2) using an

automatic telephone dialing system (ATDS) can be liable. 47 U.S.C. § 227(b)(1). The FCC's

*2015 TCPA Order* and subsequent cases make clear that Wright's claim flunks the first test

because Lyft did not send the text—*i.e.*, "make" the call—that Wright received. Rather, under

the FCC's analysis, because Lyft users must take multiple steps before invitational text messages

using Lyft's app can be sent, it is ***Lyft users*** (Jo Ann C., in Wright's case) who send the texts.

---

[1] *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd.
7961, 2015 WL 4387780 (July 10, 2015) ("2015 TCPA Order"). Relevant excerpts of this
lengthy ruling are attached hereto as Ex. A.

DEFENDANT'S RENEWED MOTION TO DISMISS
(NO. 2:14-cv-00421MJP) - 1

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Moreover, as FCC rulings and related cases demonstrate, Wright has failed to allege plausibly that Lyft used an ATDS. Under the TCPA, an ATDS includes "any equipment" with the capacity to "generate numbers and dial them *without human intervention* regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 FCC Rcd. 15391, 15392 n.5 (Nov. 26, 2012) (emphasis added). As numerous authorities interpreting this definition underscore, given the significant extent of human intervention involved in sending Lyft's invitational text messages, Lyft's messaging system is not an ATDS under the TCPA.

Wright's CEMA claims fare no better, for three reasons. First, CEMA's private cause of action under RCW 19.190.090(1) allows claims only by persons who were "injured" by the CEMA violation, and Wright alleges no material injury as a result of receiving a single text. Second, civil actions for damages under CEMA are limited to violations of RCW 19.190.080, which prohibits "phishing" misrepresentations seeking to induce disclosure of "personally identifying information." RCW 19.190.090(1), 19.190.080. Wright alleges no such claim. Finally, beyond phishing schemes, CEMA prohibits only the transmission of "commercial" texts, and the text allegedly sent to Wright is not a "commercial" text as defined under CEMA because the text itself only invited the recipient to download the app. RCW 19.190.010.

Wright also fails to state a claim under Washington's CPA. Significantly, he fails to allege any cognizable injury to business or property within the meaning of the CPA, and that failure is fatal to his CPA claim. In addition, his CPA claim cannot survive to the extent it is derivative of his failed CEMA claim.

Accordingly, and for the reasons discussed further below, Wright has failed to state a claim against Lyft, and his Amended Complaint therefore should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

DEFENDANT'S RENEWED MOTION TO DISMISS
(NO. 2:14-cv-00421MJP) - 2

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

## II.   **BACKGROUND**

Lyft operates a mobile phone application that facilitates an "on-demand peer-to-peer ridesharing" network. Am. Compl. ¶ 10. A person who wants a ride can use Lyft's application to find nearby drivers who are willing to provide it. *Id.* ¶ 11.

Lyft's application includes a feature called "Invite Friends," which allows a user to send text messages that invite her friends to download Lyft's application. *Id.* ¶ 16. Wright's claims are based on a single text he received on March 20, 2014, sent at the request of an acquaintance (Jo Ann C.) that invited him to download Lyft's free mobile phone application and offered him a free $25 Lyft ride if he did so:

> Jo Ann C. sent you a free Lyft ride worth $25. Claim it at
> http://lyft.com/getapp/MD15M215.

*Id.* ¶ 18. Four days later, based on this single allegedly "unsolicited" text, Wright filed this suit asserting Lyft violated: (i) the TCPA (47 U.S.C. § 227); (ii) Washington's Commercial Electronic Mail Act (CEMA) (RCW 19.190, *et seq.*); and (iii) Washington's Consumer Protection Act (CPA) (RCW 19.86, *et seq.*).

Text messages like the one Wright received are initiated by Lyft users, not by Lyft. *Id.* ¶ 16. Wright's allegations show that the text transmission is not triggered unless a Lyft user initiates it, and then manually completes multiple steps that each require human intervention. *See generally id.* ¶¶ 11, 16. Specifically, the "Invite Friends" function operates as follows:

(1)   The user must manually open the Lyft application on her mobile phone.



(2)   The user must then locate and open the settings menu within the application.

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

2          (3)    From that menu, the user must manually select the "Invite Friends" function. Am.

3                 Compl. ¶ 16.

4

5                                        

6

7

8

9

10         (4)    The "Invite Friends" function displays the user's phone contact list, from which

11                the user must either manually select one or more individual(s) to whom to send an

12                invitational text, or manually choose to "Select All" of her contacts at once. *Id.*

13

14                                 

15

16

17

18

19         (5)    The user then must affirmatively confirm her intent to send the invitational text

20                message by manually pressing "Send Invites."

21

22                                        

23

24

25

26

DEFENDANT'S RENEWED MOTION TO DISMISS
(NO. 2:14-cv-00421MJP) - 4

Byrnes ♦ Keller ♦ Cromwell llp
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Decl. of C. Mam (ECF No. 19) (Mam Decl.) ¶ 2.[2] Only if a user reaches the end of this process and presses "Send Invites" will Lyft's computer system process the data received from the user and send an invitational text message. Am. Compl. ¶ 16.

### III.   ARGUMENT

It is established that a plaintiff cannot state a claim by offering mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action" are insufficient to state a claim.). Rather, he must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Wright's complaint does not meet this standard; it does not even come close. Even if all of his factual allegations are accepted as true, Wright has not plausibly alleged that the elements of any of his purported causes of action are satisfied. His Amended Complaint thus fails to state claims under either the federal TCPA or the state statutes he invokes. The lawsuit should therefore be dismissed in its entirety.

### A.   Wright Fails to State a TCPA Claim.

In order to state a claim under the TCPA, Wright must allege that: "(1) the defendant called a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent." *Gragg v. Orange Cab Co.*, 995 F. Supp. 2d 1189, 1192 (W.D. Wash. 2014), *reconsideration denied*, 2014 WL 801305 (W.D. Wash. Feb. 28, 2014) (*Gragg II*). A text message is considered a "call" under the TCPA. *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 949 (9th Cir. 2009).

---

[2] The Court may consider these screen shots without converting this motion to summary judgment because Paragraphs 11, 13, and 16 of the Amended Complaint incorporate by reference the "Invite Friends" function displayed in the screen shots. *Keithly v. Intelius, Inc.*, 764 F. Supp. 2d 1257, 1261-62 (W.D. Wash. 2011) (screen shots can be considered where "review of the actual pages" would be helpful to the court and plaintiffs did not contradict defendants' assertions that the screen shots recreated a website as the plaintiffs would have seen it).

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Wright cannot plausibly allege that either of the first two elements of this test are satisfied here: under the FCC's authoritative interpretation of the TCPA (1) Lyft is not the party that makes the "calls" at issue, and (2) the text messages were not sent via an ATDS. Wright's TCPA claim must therefore be dismissed.

1.    __Wright Fails to Allege That Lyft Sent the Texts for Purposes of the TCPA.__

Only a party who "make[s]" a call using an ATDS can be liable under the TCPA. 47 U.S.C. § 227(b)(1). Wright alleges that Lyft was the party who made the call—*i.e.*, sent the text message that he received—based on the fact that the originating area code from which the text was sent is an area code assigned to San Francisco (where Lyft is headquartered). Am. Compl. ¶ 19. But this conclusory assertion scarcely amounts to a *plausible* allegation that Lyft "ma[d]e" the call in question.

Moreover, Wright's other allegations contradict his assertion that Lyft is the party that "make[s]" calls like the one he allegedly received. The process for sending invitational text messages that Wright describes in the Amended Complaint is completely *user-driven*: (1) the *user* opens the Lyft application; (2) the *user* locates and opens the settings menu within the application; (3) from the settings menu, the *user* selects "Invite Friends"; (4) the *user* selects which of her contacts (including the option to choose all of them) should receive an invitational text message; and (5) the *user* then confirms her selections by pressing "Send Invites." *See* Am. Compl. ¶ 16. It is not until the user takes each of these steps, culminating in her confirming her desire to send invitational text messages, that the user's choice is transmitted to Lyft's computer system, causing messages to be sent as directed by the user. *Id.* Under any reasonable understanding of the language of the TCPA, therefore, *users*—who are responsible for setting the "Invite Friends" functionality in motion and selecting who will receive invitational messages— are the parties that "make" calls, and Lyft is merely a conduit that facilitates those calls.

DEFENDANT'S RENEWED MOTION TO DISMISS
(NO. 2:14-cv-00421MJP) - 6

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

### a.  The FCC's 2015 TCPA Order Confirms That Users, Rather Than Lyft, "Make" the Calls at Issue Under the TCPA.

The FCC's *2015 TCPA Order* establishes beyond a doubt that the common-sense understanding of the TCPA outlined above is correct: it is *app users*, not Lyft, that send invitational texts such as the one Wright received. The FCC's analysis in its Order makes clear that when a user directs that text messages be sent to certain recipients, the user is the party that "makes" the call for purposes of the TCPA. *See generally* 2015 TCPA Order ¶¶ 18-24 (Ex. A).

Citing prior rulings, the FCC explained that the maker of a call must be a party that has "some 'direct connection . . . [to] the making of [the] call.'" *Id.* ¶ 29 (citing *DISH Declaratory Ruling*, 28 FCC Rcd. 6574, 6583 ¶ 26 (2013) (*DISH Declaratory Ruling*). This definition "'generally does not include persons or entities, such as third-party retailers, that might merely have some role, however minor, in the causal chain that results in the making'" of a call. *Id.* ¶ 27 (citing *DISH Declaratory Ruling* ¶ 26). Rather, the maker of a call must either "tak[e] the steps necessary to physically place a telephone call" or be "'so involved in the placing of a specific telephone call' as to be deemed to have *initiated* it." *Id.* ¶ 30 (emphasis added). This inquiry looks at the "totality of the facts and circumstances surrounding the placing of a particular call to determine" who the call's maker was. *Id.*

After explaining this test, the FCC applied it to the facts of petitions submitted by TextMe, YouMail, and a third company, Glide Talk. Its analysis demonstrated that a company— such as Lyft—that does not itself initiate the call but instead serves as a conduit for users' decisions to send text messages does not "make" a call within the meaning of the TCPA.

**TextMe.** The TextMe app allowed users to send and receive text messages within the United States free of charge if both parties were app users. Like the Lyft app, the TextMe app enabled users to send invitational text messages to contacts in their phone's address book by engaging in a multi-step process in which users had to make a number of affirmative choices in order to send the text: (1) tapping a button that read "invite your friends"; (2) choosing either to "invite all their friends" or to select contacts individually; and (3) sending the invitational text

message by selecting another button. The TextMe app then sent the invitational text message, which included the user's TextMe handle (*i.e.*, username) and invited the recipient to install the app. *Id.* ¶ 36.

The FCC determined that TextMe app *users*, rather than TextMe, made the invitational calls sent by the app. Although the FCC recognized that TextMe controlled the *content* of the invitational messages, it still concluded that TextMe did not send the texts because an app user had to make a number of affirmative "actions and choices" before any text could be sent. *Id.* ¶ 37. Those "actions and choices," the FCC concluded, "effectively program the cloud-based dialer to such an extent that [the user] is so involved in the making of the call as to be deemed the initiator of the call." *Id.*

**YouMail.** Similarly, the FCC determined that YouMail did not send the texts that were transmitted by its app at the direction of YouMail app users. The YouMail app allowed users to send auto-reply text messages in response to voicemails left for them by others. Each YouMail user was responsible for deciding "whether to send the auto-reply text messages, which categories of callers should receive auto-replies, how the user's name should appear in the auto-reply, and whether to include a message with the auto-reply." *Id.* ¶ 31. The FCC concluded that YouMail was "not the maker or initiator of" these texts because it exercised "no discernible involvement in deciding whether, when, or to whom an auto-reply is sent, or what such an auto-reply says"; rather, YouMail had, at most, a minor role in the causal chain that resulted in an auto-reply message being sent. *Id.* ¶¶ 32-33.

**Glide Talk.** The FCC then contrasted the TextMe and YouMail apps with that of Glide Talk, a video messaging app that the Commission held *should* be considered the "maker or initiator" of invitational text messages, in certain circumstances. The record indicated that Glide might "automatically send[] invitational texts of its own choosing to every contact in [an] app user's contact list with *little or no obvious control by the user.*" *Id.* ¶ 35 (emphasis added). Based on this absence of user control, the FCC concluded that Glide would be considered the maker or

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1    initiator of the messages because the app user "plays *no discernible role* in deciding whether to

2    send the invitational text messages, to whom to send them, or what to say in them." *Id.*

3    (emphasis added).

4              b.      **Courts Have Relied on the FCC's Analysis in the 2015 TCPA Order**
                       **to Dismiss TCPA Claims That Are Virtually Identical to Wright's.**
5

6            In the few months since the FCC issued the 2015 TCPA Order, several federal courts

7    have already relied on the Order to dismiss TCPA claims that, like Wright's claim, arose out of

8    invitational text messages sent through an app at a user's direction.

9            ***WhisperText.*** In *McKenna v. WhisperText*, No. 5:14-cv-00424-PSG, 2015 WL 5264750

10   (N.D. Cal. Sept. 9, 2015), the court dismissed the plaintiff's TCPA claim under Rule 12(b)(6).

11   Like the TextMe app, the WhisperText app could send invitational text messages "only at the

12   user's affirmative direction to recipients selected by the user." *Id.* at *2. The court explained that

13   in light of the FCC's ruling, WhisperText was not the "maker or initiator of a call . . . under the

14   TCPA," because a user's essential role in electing to send messages and determining who would

15   receive them made him or her "'so involved in the making of the call as to be deemed the

16   initiator of the call.'" *Id.* at *5 (quoting 2015 TCPA Order ¶ 37). It therefore held that the

17   plaintiff had failed to state a TCPA claim. *Id.* at *5.

18           ***Shopkick.*** The app at issue in *Huricks v. Shopkick, Inc.*, No. C-14-2464 MMC, 2015 WL

19   5013299 (N.D. Cal. Aug. 24, 2015), similarly required user direction before invitational text

20   messages could be sent. A Shopkick app user had to (1) affirmatively grant the app permission to

21   access the user's contacts, (2) select "Continue" rather than "No Thanks" when the app provided

22   the user with the option to "invit[e] friends," (3) proceed through a series of screens on which the

23   user was given the option of selecting the contacts to whom the invitations would be sent, and

24   (4) press a button stating "Invite Friends" after reviewing a screen listing the chosen contacts and

25   displaying the "format" in which the invitations were to be sent. The court found these steps to

26   be "indistinguishable in all material respects from the steps a user of the TextMe app must take

     to cause the TextMe invitational texts" to be sent, and accordingly held that, based on the FCC's

DEFENDANT'S RENEWED MOTION TO DISMISS
(NO. 2:14-cv-00421MJP) - 9

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

2

analysis of TextMe's petition, Shopkick was not the maker of a call and thus "ha[d] not violated the TCPA." *Id. at* \*3, 5.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

As it was in *WhisperText* and *Shopkick*, the FCC's reasoning is dispositive here. Lyft's computer system transmits invitational text messages *only after* a Lyft user has directed that the messages be sent, selected which of her contacts will receive the messages, and confirmed that she wants to send the messages. Here, as in *WhisperText*, "it is undeniable . . . that the human intervention of a . . . user is necessary to set those processes in motion." 2015 WL 5264750, at \*3. And as the *Shopkick* court held, "the steps the user must have taken to cause the . . . invitational text messages to be sent are indistinguishable in all material respects from the steps a user of the TextMe app [at issue in the FCC Order] must take to cause the TextMe invitational texts to be sent, which steps . . . are tapping a button stating 'invite your friends,' choosing which contacts to invite, and choosing to send the text messages by tapping another button." 2015 WL 5013299, at \*3. Therefore, as *WhisperText* and *Shopkick* highlight, under the FCC's ruling, a Lyft user is "so involved in the making of the call as to be deemed the initiator of the call" under the TCPA. 2015 TCPA Order ¶ 37. Lyft itself is neither the maker nor the initiator of these messages. Wright's TCPA claim against Lyft must therefore be dismissed.

17

18

**2.      Wright Fails to Allege That Lyft Used an ATDS to Send the Text.**

19

20

21

22

23

24

25

26

Wright's TCPA claim also fails because he does not plausibly allege that the texts were sent using an ATDS. The FCC has previously held that the definition of an ATDS covers "any equipment" with the capacity to "generate numbers and dial them *without human intervention* regardless of whether the numbers called are randomly or sequentially generated or come from calling lists." *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 FCC Rcd. 15391, 15392 n.5 (Nov. 26, 2012) (emphasis added). In the 2015 TCPA Order, the Commission further clarified that "[h]ow the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the

Byrnes ♦ Keller ♦ Cromwell llp
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

equipment functions and depends on human intervention, and is therefore a case-by-case determination." 2015 TCPA Order ¶ 17.[3]

Under the FCC's interpretation, Wright has not plausibly alleged that Lyft uses an ATDS. He alleges, in conclusory fashion and without pleading any corroborating *facts*, that Lyft's application is a system that "operates as an automatic telephone dialing system." Am. Compl. ¶ 17. He also asserts—again without factual support—that Lyft's system has the "ability to dial numerous cellular telephone numbers and to transmit numerous text messages to large lists of stored cellular telephone number[s] without any human involvement" and that it "sequentially generate[d]." *Id.* ¶¶ 13, 16. But these threadbare allegations do not support a plausible inference that Lyft's system has the capacity to dial calls "without human intervention."

Indeed, the factual allegations in the Amended Complaint suggest just the opposite—that Lyft's messaging system is *not* an ATDS because it involves a significant degree of human intervention. Wright alleges that Lyft's users, such as "Jo Ann C.," deliberately select specific people with particular phone numbers from among their own contacts, on their own mobile phones, and agree to initiate text messages to those recipients that are then sent through Lyft's computers. Am. Compl. ¶ 16.

Numerous authorities interpreting the statutory definition of an ATDS confirm that, given this significant extent of "human intervention," Lyft's messaging system is not an ATDS under the TCPA. For example, in *WhisperText*, the court held that the plaintiff could not state a claim that the messages he received were sent by an ATDS because his "statements that the Whisper App sends text invitations only at the user's affirmative direction foreclose[d] any plausibility

---

[3] The Commission declined to adopt a strict "human intervention" test that would have provided that equipment is not an autodialer "unless it has the capacity to dial numbers without human intervention." 2015 TCPA Order ¶ 20. A number of parties have filed petitions for appellate review of this portion of the 2015 TCPA Order, on the ground that the FCC's interpretation exceeds its statutory authority. *See, e.g., Prof'l Ass'n for Customer Engagement, Inc. v. FCC*, No. 15-2489 (7th Cir. filed July 14, 2015); *Sirius XM Radio, Inc. v. FCC*, No. 15-1218 (D.C. Cir. filed July 14, 2015); *ACA Int'l v. FCC*, No. 15-1211 (D.C. Cir. filed July 10, 2015).

DEFENDANT'S RENEWED MOTION TO DISMISS
(NO. 2:14-cv-00421MJP) - 11

that WhisperText sends messages using an ATDS, without human intervention." 2015 WL 5264750, at *3; *see generally id.* at *3-7. Similarly, in *Luna v. Shac, LLC*, No. 14-cv-00607-HRL, 2015 WL 4941781, ___ F. Supp. 3d ___ (N.D. Cal. Aug. 19, 2015), the court granted summary judgment to a defendant who allegedly sent text messages using a web-based platform, holding that the platform was not an ATDS. The court explained that significant human intervention was required to use the platform: an employee had to first input phone numbers into the platform, then log in to the platform to draft a message, then designate the numbers to receive the message, and finally click "send." *Id.* at *4-5. Thus, the messages were not sent by an ATDS. *Id.* at *5; *see also Glauser v. GroupMe, Inc.*, No. C11-2584 PJH, 2015 WL 475111, at *6-7 (N.D. Cal. Feb. 4, 2015) (holding that plaintiff "failed to raise a triable issue of fact as to whether defendant's texting equipment had the capacity to dial numbers without human intervention" because texts could not be sent to a recipient until a human group creator intervened by adding the recipient to a GroupMe group).

Lyft's "Invite Friends" functionality, like the messaging systems in *WhisperText*, *Luna*, and *GroupMe*, cannot send texts without extensive human intervention—*i.e.*, the express actions and choices of a Lyft app user, who selects the recipients of the messages and directs that the messages be sent. Thus, Wright cannot plausibly allege that the invitational text he received was sent using an ATDS, as the TCPA requires. *Cf. Gragg II*, 995 F. Supp. 2d at 1194 (holding that the defendant's computer messaging program for taxi drivers was not an ATDS because taxi drivers had to manually press a button before the text message was sent, making human intervention "essential" to the process).

**B.     Wright Fails to Allege a Claim Under CEMA.**

Wright's Amended Complaint also fails to state a CEMA claim. RCW 19.190.090(1), which is the statute that defines the civil claims allowed under CEMA, provides:

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

**19.190.090. Civil actions**

> (1) A person *who is injured* under this chapter may bring a civil action in the superior court to enjoin further violations, and to seek up to five hundred dollars per violation, or actual damages, whichever is greater. A person who seeks damages under this subsection *may only bring an action against a person or entity that directly violates RCW 19.190.080.*

RCW 19.190.090(1) (emphases added). Wright's Amended Complaint fails to state a CEMA claim for three reasons. First, CEMA civil claims may be brought only by persons who have been "injured," and Wright alleges no cognizable CEMA injury. Second, CEMA civil claims are limited to violations of CEMA's anti-phishing statute (RCW 19.190.080), and Wright does not allege a phishing claim. Third, even if CEMA's civil cause of action did extend beyond phishing claims, CEMA only prohibits sending "commercial" text messages, and the text at issue in this case is not "commercial" within the meaning of the statute.

**1.      Wright Fails to Allege Injury Due to Receipt of a Single Text Message.**

Wright's claims fail because he does not allege any actual injury. The plain language of CEMA demands that a plaintiff suffer actual harm: Only a "person **who is injured** under this chapter may bring a [CEMA] civil action." RCW 19.190.090(1) (emphasis added). Washington courts have construed similar statutory provisions as requiring a showing of actual and material injury. *See State, Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 43 P.3d 4, 10 (Wash. 2002) (courts may look to a related statute to determine the intent of a statute). Most notably, under the CPA, which allows "any person **who is injured**" in their business or property to bring a civil action, the courts require plaintiffs to show actual injury to their business or property. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 532 (Wash. 1986) (emphasis added); *see also* Section III.C.2, *infra*. Thus, to have standing under CEMA, Wright must actually have been injured in a material way by the text message that he allegedly received.

Wright cannot meet that test. It is not enough to seek statutory damages, since if statutory damages alone were sufficient, there would be no reason to allow civil claims to be brought only by a person "who is injured" under CEMA; that clause would be rendered superfluous. Further,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Wright alleges no facts showing that he was actually and materially damaged by receipt of the text message. For example, he does not allege (nor could he) that he incurred any *additional* charges for receiving the text message. He alleges that he had to pay his usual mobile phone bill (Am. Compl. ¶ 27), but that cost does not amount to damage or injury because Wright would have incurred it in any event.

Similarly, Wright alleges that the text message caused "[l]oss of use of the full capacities and capabilities" of his phone, such as electronic storage space and battery energy. Am. Compl. ¶ 27. However, this allegation is not supported by any facts showing that the text message actually interfered in any way with his use of the mobile phone or its capabilities. And it is wholly implausible that a solitary text message had these deleterious effects on his phone.

Wright further contends that invitational text messages regarding Lyft have "burdened or injured the telecommunications infrastructure," such that "cellular service providers incurred avoidable costs which negatively impact the price that consumers," like Wright, "must pay for cellular telephone services." Am. Compl. ¶ 21. However, this speculative chain of inferences about the theoretical, indirect, and remote effects that promotional text messages might have on the price of mobile phone services does not constitute a plausible allegation of injury to Wright. Indeed, it is "far beyond speculative" that the text messages burdened the network in such a way that would cause Wright any injury. *Cf. Gragg v. Orange Cab Co.*, 942 F. Supp. 2d 1111, 1119 (W.D. Wash. 2013) (*Gragg I*), *rev'd on other grounds, Gragg v. Orange Cab. Co.*, 2015 WL 6870609 (W.D. Wash. Nov. 9, 2015) (*Gragg III*).[4]

---

[4] In *Gragg III*, the Court reinstated the CPA claims dismissed in *Gragg I*, not because the injuries alleged were sufficient to constitute the requisite "injury to business or property" required to establish a stand-alone CPA claim (*Gragg III*, 2015 WL 6870609, at *5 ("The Court has already found that plaintiff failed to alleged a cognizable injury to business or property … and sees no reason to reconsider that issue")), but rather because it found that RCW 19.190.040(1) constituted a legislative finding that a CEMA violation caused damages that satisfied the last two elements of a CPA claim. *Id.* at *3-6. Respectfully, Lyft submits that the latter holding was in error, as discussed below.

DEFENDANT'S RENEWED MOTION TO DISMISS
(NO. 2:14-cv-00421MJP) - 14

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Wright's other allegations of injury, such as "invasion of privacy" and "annoyance from having to retrieve" the text message, are similarly inadequate. Am. Compl. ¶ 27. Wright does not explain how simply *receiving* a text message—something many people do dozens, perhaps hundreds of times a day—infringed on his privacy or caused him annoyance and, in any event, any such effect from the single text message Wright allegedly received would be *de minimis*.

CEMA requires more than a request for statutory damages. Wright must show that he was substantively "injured" (RCW 19.190.090(1)) by the alleged violation of CEMA. Wright's failure to allege any actual injury is dispositive, and itself requires dismissal of his CEMA claim.

2.      **CEMA Does Not Provide a Private Right of Action for Allegedly Improper Text Messages Unless the Claim Involves an Alleged "Phishing" Violation.**

Wright's CEMA claim also fails because CEMA does not provide a private cause of action under these circumstances. RCW 19.190.090(1) – the statute that defines "Civil Actions" under CEMA – provides: "A person who seeks damages under this subsection may only bring an action against a person or entity that directly violates RCW 19.190.080." That specific provision, in turn, extends only to phishing, *i.e.* "tak[ing] any action to induce a person to provide personally identifying information" by misrepresenting oneself "to be another person, without the authority or approval of such other person." RCW 19.190.080. To the extent the civil cause of action created in RCW 19.190.090(1) is inconsistent with the previously-enacted RCW 19.190.040(1) (defining statutory damages for CEMA violations), the Court must defer to the Legislature's most recent decision to amend the statute by enacting RCW 19.190.080 and 090(1), which expressly limit recovery of monetary damages to phishing schemes. *Agne v. Rain City Pizza, LLC*, 2011 WL 11798573 (W.D. Wash. June 17, 2011) (finding CEMA civil claims to be limited to phishing schemes in violation of RCW 19.190.080); *see also Gragg III*, 2015 WL 6870609, at *3-5.

Wright does not allege such a phishing violation. Although he vaguely claims that the text messages are deceptive because a consumer would have to provide some unspecified "consideration" to use the Lyft application, such an allegation does not implicate the "phishing"

prohibition of RCW 19.190.080. Am. Compl. ¶ 24. Instead, Wright would need to allege that the text message he received was some sort of subterfuge or misrepresentation by which he was tricked into revealing, for example, his credit card information. Of course, Wright cannot do so, and has not tried. Because he does not allege that Lyft violated RCW 19.190.080, and because CEMA does not provide a private cause of action seeking damages for violations of other parts of CEMA (RCW 19.190.090(1)), that claim fails.

### 3.   The Text Message Here Is Not "Commercial."

Wright's CEMA claim fails for an additional reason. CEMA only prohibits sending "commercial" text messages to mobile phones. RCW 19.190.060(1); *see also Hickey v. Voxernet, LLC*, 887 F. Supp. 2d 1125, 1132 (W.D. Wash. 2012). Specifically, the relevant statute reads, in pertinent part:

> (a)   No person conducting business in the state may initiate or assist in the transmission of an electronic *commercial* text message to a telephone number assigned to a Washington resident for cellular telephone or pager service that is equipped with short message capability or any similar capability allowing the transmission of text messages.

RCW 19.190.060(1) (emphasis added). CEMA defines a "commercial electronic text message" as a message "sent to promote real property, goods, or services *for sale or lease.*" RCW 19.190.010(3) (emphasis added).

The Amended Complaint asserts, without foundation, that the text message was "commercial" and promotes "the sale of Defendant's services through the Lyft app." *See* Am. Compl. ¶¶ 2, 17, 24. But this conclusory allegation is insufficient to state a claim for relief. *Iqbal*, 556 U.S. at 678, 680. Instead, to state a claim under CEMA, Wright must plead *facts* showing that the text message promoted the sale of goods or services. He has not done so.

This Court's decision in *Voxernet* is instructive on this point. There, this Court held that an invitation to download a free mobile phone application does not meet the statutory definition of "commercial." *Voxernet*, 887 F. Supp. 2d at 1132. The *Voxernet* defendant sent text messages from a subscriber's contact list to non-subscribers. *Id.* at 1128. The text message read "Get on

Voxer," followed by a link to download the defendant's application. *Id.* The plaintiff had not, and could not have, alleged that he had to pay for the application, which was free. *Id.* at 1132. The court reasoned that this invitational text was not "commercial," noting that the ordinary meaning of "sale includes 'a price in money'" and that other courts had found that software updates, which likewise are free to the consumer, are not "sales." *Id.* (citing Black's Law Dictionary (9th ed. 2009); *Wofford v. Apple Inc.*, No. 11-CV-0034 AJB NLS, 2011 WL 5445054, at *2 (S.D. Cal. Nov. 9, 2011)). It therefore dismissed the plaintiff's CEMA claim. *Id.*[5]

The facts alleged by Wright are quite similar to those in *Voxernet*. Wright received a text message from "Jo Ann C." that offered him a free $25 Lyft ride and included a link inviting him to download the free Lyft mobile phone application. Am. Compl. ¶ 18. The Amended Complaint vaguely alleges that a consumer receiving this text must provide some unspecified consideration to use the Lyft application. *Id.* ¶ 24. However, there is no allegation that the consumer must pay anything to download the free application. *Voxernet*, 887 F. Supp. 2d at 1132.

Nor could Wright make such an allegation. The link in the text message led to this information:



---

[5] *But see Gragg III*, 2015 WL 6870609, at *1-3.

DEFENDANT'S RENEWED MOTION TO DISMISS
(NO. 2:14-cv-00421MJP) - 17

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

As this screen shot confirms, the Lyft application is *free* to download. Mam Decl. ¶ 3.[6] There is no requirement for an exchange of money or any other "sale" to get the application Wright was invited to download, or even to get the $25 free ride. Accordingly, the factual allegations do not show that the text was sent to promote a "sale or lease." Thus, the text message was not "commercial" under CEMA, and Wright's CEMA claim must be dismissed.

**C.    Wright Fails to Allege a Claim Under the CPA.**

Finally, Wright's CPA claim should be dismissed because (1) the CPA claim is derivative of Wright's failed CEMA claim, and thus also fails, and (2) Wright has not alleged a cognizable injury under the CPA.

The elements of a claim under the CPA are: "(1) [an] unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation." *Hangman Ridge*, 719 P.2d at 533. A person "who is injured in his or her business or property" is granted a private right of action for the violation. RCW 19.86.090.

**1.    Wright's Derivative CPA Claim Fails Because the Underlying CEMA Claim Fails.**

Wright alleges that Lyft's purported violation of CEMA is also a per se violation of the CPA. But because Wright does not, and cannot, state a CEMA claim, as discussed above, his derivative CPA claim also fails. *See Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1065 (9th Cir. 2009) ("Because [the plaintiff's] CEMA claims fail as a matter of law, his CPA claims, to the extent grounded in CEMA violations, are likewise inadequate and were properly dismissed.").

Nor is a violation of CEMA's prohibition against commercial text messages (RCW 19.190.060) a per se violation of the CPA. The Legislature enacted CEMA well after *Hangman Ridge* clearly held that a private CPA claim has five elements. Where the Legislature

---

[6] The Court may consider this screen shot without converting this motion to summary judgment because the Amended Complaint, at ¶ 18, incorporates by reference the link to download. *See Keithly*, 764 F. Supp. 2d at 1261-62.

DEFENDANT'S RENEWED MOTION TO DISMISS
(NO. 2:14-cv-00421MJP) - 18

Byrnes ♦ Keller ♦ Cromwell llp
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

specifically defines the exact relationship between a statute and the CPA, a court must acknowledge that defined relationship. *Hangman Ridge*, 105 Wn.2d at 787. Where the Legislature intends a statute to per se establish all five elements, it does so expressly. *See* RCW 80.36.400(3) ("A violation of this section is a violation of chapter 19.86 RCW [i.e., the CPA]."); RCW 19.118.041(4) ("A violation of ... this chapter is a per se violation of chapter 19.86 RCW."); RCW 19.130.060 ("Violation of this chapter constitutes violation of chapter 19.86 RCW . . . .").

The only CEMA violation that the Legislature has expressly defined to be a "violation of the consumer protection act, chapter 19.86 RCW" is the transmission of certain commercial emails. RCW 19.190.030(1) and (2). There is no such expression, however, in regard to commercial texts *or* phishing violations. The only expressions by the Legislature regarding the CPA as it pertains to commercial texts are in RCW 19.190.060(2) and .100, which declare a violation of RCW 19.190.060(1) to satisfy the first three *Hangman Ridge* CPA elements. But such an allegation does not establish the fourth and fifth elements of CPA—injury and causation. *Gordon v. Virtumundo, Inc.*, 2006 WL 3873368, at *5-6 (W.D. Wash. Dec. 8, 2006).[7] Neither of these statutes speaks to "injury to plaintiff in his or her business or property," or to causation. Having expressly defined the relationship between CEMA commercial text violations and CPA in these provisions, it would contravene the plain language to infer that CEMA's statutory damages as defined in RCW 19.190.040 – which contains no expressed relationship to CPA injury – as *impliedly* satisfying the CPA's fourth and fifth elements as to commercial texts.[8]

---

[7] *See also, e.g., In re Bryce*, 491 B.R. 157, 184-85 (Bankr. W.D. Wash. 2013) (statutes that declare usury violation of Mortgage Brokers Practice Act to be unfair acts or practices that impact public interest satisfy only 3 of 5 CPA elements); *Ornelas v. Fid. Nat'l Title Co.*, 245 F. App'x 708 (9th Cir. 2007) (statutes declaring that violations of Consumer Loan Act affect public interest and are unfair and deceptive acts and methods of competition establish *per se* violations of only first three of five CPA elements).

[8] In reversing its prior ruling in *Gragg I* dismissing the plaintiff's CPA claims, the Court in *Gragg III* erred in disregarding this legislatively-expressed distinction between commercial email violations, on the one hand, and commercial text and phishing violations.

DEFENDANT'S RENEWED MOTION TO DISMISS
(NO. 2:14-cv-00421MJP) - 19

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Rather, in such cases (and as it did in establishing a civil action for phishing violations in RCW 19.190.090(1)), the Legislature clearly, and reasonably, elected to retain the requirement that a CPA plaintiff plead and prove actual injury before being allowed to pursue a civil CPA claim. RCW 19.190.040 merely expands the damages that can be recovered upon proof of such injury to up to $500, even if that exceeds the treble damages otherwise allowed under the CPA.

### 2.   Wright Fails to Allege Injury to Business or Property.

CEMA's unambiguous language thus dictates that a violation of CEMA's commercial text restrictions establishes only the first three CPA elements. In such cases, the Legislature clearly, and reasonably, elected to limit CPA claims based on CEMA violations to cases where a plaintiff alleges a cognizable injury to business or property and causation. Wright cannot plausibly allege that either of these elements is satisfied.

The CPA requires injury to "business or property." *Hangman Ridge*, 719 P.2d at 535; RCW 19.86.090. Thus, personal injuries do not suffice to establish a CPA violation:

> Personal injuries, as opposed to injuries to "business or property," . . . do not satisfy the injury requirement. Thus, damages for mental distress, embarrassment, and inconvenience are not recoverable under the CPA. However, the injury requirement is met upon proof the plaintiff's property or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal.

*Gragg I*, 942 F. Supp. 2d at 1118 (quoting *Panag v. Farmers Ins. Co. of Wash.*, 166 Wn.2d 27, 57, 204 P.3d 885 (2009)).

In *Gragg I*, the plaintiff had alleged the following injuries arising from an "unsolicited" text message: (1) paying for cell phone service (but not above plaintiff's normal bill); (2) invasion of privacy; (3) aggravation and annoyance; (4) loss of full mobile phone capacity because of use of electronic storage space; and (5) general burdens on the entire cellular network. *Id.* at 1118-19. Judge Lasnik held that each of these alleged injuries was either a "personal" injury not cognizable under the CPA or too speculative to state a claim. *Id.*

DEFENDANT'S RENEWED MOTION TO DISMISS
(NO. 2:14-cv-00421MJP) - 20

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington 98104
(206) 622-2000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

For the same reasons, Wright's alleged injuries fail to state a cognizable injury to business or property under the CPA. First, the Amended Complaint alleges that Wright was injured by "[h]aving to pay a cellular service provider to receive the unsolicited text message." Am. Compl. ¶ 27. This allegation fails to plead any actual damages or injury to Wright within the meaning of the CPA. As explained above, Wright does not allege that he paid *more* for his phone service because of his having received the Lyft text message. Thus, this assertion of harm is not a plausible allegation of CPA injury. *Gragg I*, 942 F. Supp. 2d at 1118.

Second, Wright alleges that the text message invaded his privacy. Am. Compl. ¶ 27. This alleged injury is a "personal injury" that is not cognizable under the CPA. *Gragg I*, 942 F. Supp. 2d at 1118-19. (It is also implausible, for reasons stated above.)

Next, Wright alleges the text message was an "[a]ggravation and annoyance." Am. Compl. ¶ 27. Again, this is an alleged "personal injury," rather than an injury to "business or property," and is not cognizable under the CPA. *Gragg I*, 942 F. Supp. 2d at 1119.

Additionally, Wright alleges that the text message caused "[l]oss of use of the full capacities and capabilities" of his phone, such as electronic storage space and battery energy. Am. Compl. ¶ 27. However, this allegation is not supported by any facts showing that the text message actually interfered with his use of the mobile phone or its capabilities, such as by occupying enough of his phone's storage space to have a discernible effect. And, although a temporary loss of use of property may constitute injury, the loss of use of a rechargeable battery or temporary loss of storage space due to a single text message that is gone when deleted is such an "infinitesimal, fleeting loss" that it can only be described as a mere "uncompensable inconvenience." *Gragg I*, 942 F. Supp. 2d at 1119. Wright's alleged "[l]oss of use" injuries thus do not constitute cognizable injuries to business or property. *Id.*

Finally, the Amended Complaint alleges that Lyft's text messages "burdened or injured the telecommunications infrastructure" and that "cellular service providers incurred avoidable costs which negatively impact the price that consumers like Plaintiffs must pay for cellular

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington 98104
(206) 622-2000

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

telephone services." Am. Compl. ¶ 21. Accordingly, Wright alleges that he was injured because the cellular network he relies on was impaired or burdened. *Id.* ¶ 27. As in *Gragg*, however, this fails because it is "far beyond speculative" that the text messages burdened the network in such a way that would cause Wright any pecuniary injury. *Gragg I*, 942 F. Supp. 2d at 1119.

Because Wright has not plausibly alleged any injury to his business or property caused by Lyft, his CPA claim must be dismissed.

<h3 style="text-align:center">IV.    <u>CONCLUSION</u></h3>

For the foregoing reasons, this Court should dismiss the complaint with prejudice.

DATED this 19th day of November, 2015.

BYRNES KELLER CROMWELL LLP

By /s/ Bradley S. Keller
    Bradley S. Keller, WSBA #10665
By /s/ Keith D. Petrak
    Keith D. Petrak, WSBA #19159
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
Email: bkeller@byrneskeller.com
      kpetrak@byrneskeller.com
***Attorneys for Defendant Lyft, Inc.***

DEFENDANT'S RENEWED MOTION TO DISMISS
(NO. 2:14-cv-00421MJP) - 22

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

1

2

## <u>CERTIFICATE OF SERVICE</u>

3
    The undersigned attorney certifies that on the 19th day of November, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel on record in the matter.

4

5
                          /s/ Keith D. Petrak

6
                          Byrnes Keller Cromwell LLP

7
                          1000 Second Avenue, 38th Floor

                          Seattle, WA 98104

8
                          Telephone: (206) 622-2000

                          Facsimile: (206) 622-2522

9
                          kpetrak@byrneskeller.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000