UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH WRIGHT,

          Plaintiff,

     v.

LYFT, INC.,

          Defendant.

CASE NO. 2:14-CV-00421 MJP

ORDER ON MOTION TO DISMISS

The Court, having received and reviewed:

1. Defendant's Renewed Motion to Dismiss (Dkt. No. 54)

2. Plaintiff's Opposition to Defendant's Renewed Motion to Dismiss (Dkt. No. 56)

3. Defendant's Reply in Support of Renewed Motion to Dismiss (Dkt. No. 57)

and all attached declarations and exhibits, makes the following ruling:

IT IS ORDERED that the motion is PARTIALLY GRANTED and PARTIALLY
DENIED; Plaintiff's TCPA claim is DISMISSED, and the motion is DENIED as to the
remaining causes of action.

1    IT IS FURTHER ORDERED that the parties shall show cause within 14 days from the

2    filing of this order why the Court should not decline to exercise supplemental jurisdiction on

3    Plaintiff's remaining state law claims.

4                                    **Background**[1]

5    This is a putative class action lawsuit in which Plaintiff Kenneth Wright ("Wright")

6    alleges, on his own behalf and on behalf of those similarly situated, violations of: (1) the Federal

7    Consumer Telephone Protection Act ("TCPA"); (2) Washington's Commercial Electronic Mail

8    Act ("CEMA"); and (3) Washington's Consumer Protection Act ("CPA") against Defendant

9    Lyft, Inc. ("Lyft").  (Dkt. No. 62, SAC at 11-14.)  Wright seeks damages and injunctive and

10   declaratory relief.  (Id. at 16-18.)

11   Lyft—a transportation company—has created a mobile phone application (the "Lyft

12   app") that facilitates peer-to-peer ridesharing.  (SAC at ¶ 10.)  Wright pursues federal and state

13   consumer protection claims against Lyft arising out of its alleged use of users' cell phone

14   contacts lists to send text message advertising to third-party consumers.  (Id. at ¶ 2)

15   Wright alleges on April 20, 2014 he received an unsolicited text message advertisement

16   transmitted by or on behalf of Lyft using an automatic telephone dialing system ("ATDS").  (Id.

17   at ¶ 23.)  The message told Wright that "Jo Ann C." had sent him a "free Lyft ride worth $25"

18   and instructed Wright to claim the free ride by downloading the Lyft app.  (Id.)  Wright contends

19   that while the text message purported to be from "Jo Ann C.," one of his contacts, the text

20   message was actually from Lyft.  (Id. at ¶ 24.)

21   Wright alleges Lyft users are prompted to access an "invite friends" function of the Lyft

22   app to enable the Lyft app to access non-user data on their cell phones.  (Id. at ¶ 26.)  Wright

23   _____

24   [1] Plaintiff's motion to file a Second Amended Complaint ("SAC") was granted.  (Dkt. No. 61.)  The citations to his complaint refer to that document. (Dkt. No. 62.)

alleges Lyft users can then identify specific cell phone contacts or choose a "Select All" function to transmit information regarding all of their cell phone contacts to Wright's computer systems. (Id. at ¶ 19.)  Wright contends Lyft's computer systems then use this information to "sequentially generate advertising text messages to nonusers" of Lyft's app.  (Id. at ¶ 21.)  Wright claims Lyft uses an ATDS to send thousands of similar text message advertisements to third-party consumers.  (Id. at ¶ 26.)

Wright alleges he sustained the following injuries from receiving Lyft's unsolicited text message advertising: (1) having to pay a cellular service provider to receive the unsolicited text message from Lyft; (2) invasion of privacy; (3) aggravation and annoyance from having to retrieve the unsolicited text message; (4) loss of full capabilities of his cell phone; (5) loss of energy stored in the battery of his cell phone; and (6) impairment or burden on the cell phone network on which Wright relies.  (Id. at ¶ 32.)

Wright seeks to represent a national class under federal law and a Washington State subclass under Washington law comprising anyone who has received "at least one text message containing an advertisement or promotion to download the Lyft app, where the text message was sent through [Lyft's] computer systems."  (Id. at ¶¶ 35-36.)

**<u>Discussion</u>**

<u>TCPA</u>

The TCPA makes it unlawful for any person "to make any call (other than a call made . . . with the prior express consent of the called party) using any automatic telephone dialing system ["ATDS"] ... to any telephone number assigned to a. . . cellular telephone service. . ." <u>Gragg v. Orange Cab Co.</u>, 942 F. Supp. 2d 1111, 1113 (W.D. Wash. 2013; "<u>Gragg I</u>").  The TCPA defines an ATDS as "equipment which has the capacity—(a) to store or produce telephone numbers to be called, using a random or sequential number generator; and (b) to dial such numbers."  47

1 │ U.S.C. §227(a)(1).  The Ninth Circuit has held that a text message is a "call" under the TCPA.

2 │ Satterfield v. Simon & Schuster, Inc., 569 F.3d 946, 951-52 (9th Cir. 2009).

3 │      This matter was stayed (and a ruling on this motion to dismiss deferred) so the Court

4 │ could have the benefit of the results of two petitions pending before the Federal Communications

5 │ Commission ("FCC") seeking declaratory relief clarifying what an ATDS is and whether

6 │ invitational text messages are actionable under the TCPA.  (Dkt. No. 18.)  The Court's analysis

7 │ of that document (attached to Defendant's renewed motion as Ex. A; Dkt. No. 54) finds that,

8 │ regarding Plaintiff's TCPA claim, it favors Defendant's position.

9 │      The FCC states, in connection with the issue of who "makes" the call (or sends the text)

10 │ for purposes of the statute, that the maker of the call must be a party with "some 'direct

11 │ connection'… [to] the making of [the] call" (Id. at ¶ 29), a definition which excludes "persons or

12 │ entities, such as third-party retailers, that might have some role, however minor, in the causal

13 │ chain that results in the making" of a call.  (Id. at ¶ 27.)  The maker of the call is determined by

14 │ looking at "the totality of the facts and circumstances surrounding the placing of a particular

15 │ call" to determine the party who either "[took] the steps to physically place a telephone call" or

16 │ was "'so involved in the placing of a specific telephone call' as to be deemed to have initiated

17 │ it."  (Id. at ¶ 30.)

18 │      If this sounds like a description of the person who decided to "invite" persons from their

19 │ contact list to use an app, the FCC's advisory ruling on TextMe's Petition for Expedited

20 │ Declaratory Ruling and Clarification makes it clear: "invitational" messages sent at the behest of

21 │ existing users of an app or system do not fall within the ambit of the TCPA.  TextMe (an app

22 │ which provides access to text message and voice calling services) utilizes an "invite your

23 │ friends" system that is virtually indistinguishable from Defendant's.  In the clarifying 2015

24 │

1  order, the FCC states: "TextMe does not make or initiate a call when one of its app users sends

2  an invitational text message using the steps outlined below." (Id. at ¶ 36.)

3       The steps outlined describe a system where "app users invite friends to use TextMe 'via

4  text message by engaging in a multi-step process in which users ha[ve] to make a number of

5  affirmative choices throughout the invite process.'" (Id.)  "These affirmative choices by the app

6  user lead us to conclude that the app user and not TextMe is the maker of the invitational text

7  message… [T]he app user's actions and choices effectively program the cloud-based dialer to

8  such an  extent that he or she is so involved in the making of the call as to be deemed the initiator

9  of the call."  (Id. at ¶ 37.)

10      Plaintiff attempts to distinguish the TextMe petition on the grounds that the TextMe

11  system told the app users that an invitational *text message* would be sent, whereas "Lyft did not

12  tell users whether an "invite" would be sent by U.S. Mail, email, a personal telephone call, or

13  some other method." (SAC at ¶ 20.)  The Court finds this distinction of questionable materiality

14  and the speculation/allegation definitely implausible; i.e., it is not plausible that "Jo Ann C." did

15  not know, at the moment she pushed the "Send Invite" button, that Plaintiff would receive an

16  email or text message.

17      Although the parties expend a lot of briefing discussing whether the system which

18  generated the invitational text message is an ATDS, the Court declines to reach that issue.  First,

19  Plaintiff's allegation it was an ATDS is sufficient for now.  Although Defendant complains about

20  the lack of "corroborating facts" in the complaint, this is a 12(b)(6) motion, not a summary

21  judgment request – unless they are implausible, impossible or contradicted by other portions of

22  the pleading, Plaintiff is entitled to an assumption that his factual allegations are true at this stage

23  of the proceedings.   More to the point, the FCC's TextMe ruling resolves whether this form of

24

1    user-generated invitational text message falls within the restrictions of the TCPA.  The answer is

2    "no."  Defendant is entitled to a dismissal of the TCPA claim and the Court will so order.

3    <u>Commercial Electronic Message Act</u>

4            Plaintiff has alleged that Defendant's practices violate the Commercial Electronic Mail

5    Act (CEMA), RCW 19.190.010 *et seq*.  The statute was originally enacted in 1998 to deal with

6    unwanted commercial email messages.  It contained no language authorizing a private civil

7    action.  Instead, the Legislature simply declared that sending certain commercial emails was a

8    CPA violation (RCW 19.190.030(2)) – first, that it *per se* established the first three elements of a

9    CPA claim (unfair or deceptive act in trade or commerce that affected the public interest)( RCW

10   19.190.030(3)); and, second, that a person receiving a commercial email suffered "damages"

11   equivalent to the greater of $500 or their actual damages.  (RCW 19.190.040(1)).  There is no

12   explanation regarding why the legislature split the elements of a CPA claim in two, but the

13   language of RCW 19.190.030(2) and legislative history make clear that the intention was to

14   make the transmission of an unlawful email a *per se* violation of the CPA.  ("[A] violation of the

15   Consumer Protection Act occurs when a sender" sends a message in violation of CEMA; Wash.

16   Final Bill Rep., 1998 Reg.Sess. H.B. 2752 (April 6, 1998).)

17           That was just the beginning of this rather labyrinthine statutory scheme.  In 2003, CEMA

18   was amended to include prohibitions on "initiation or assistance" of sending electronic

19   commercial text messages:

20           No person conducting business in the state may initiate or assist in the transmission of an
             electronic commercial text message to a telephone number assigned to a Washington
21           resident for cellular telephone or pager service that is equipped with short message
             capability or any similar capability allowing the transmission of text messages.
22
23   RCW 19.190.060(1).  Additionally, RCW 19.190.040 (the original "damages" provision) was

24   amended to include "commercial text messages."

1    Unlike the preceding portion of the statute, however, the legislature did not declare

2    sending commercial text messages to be a *per se* CPA violation, choosing instead to simply

3    declare that "the practices covered by this section are matters vitally affecting the public interest

4    for the purpose of applying the consumer protection act… A violation of this section… is an

5    unfair or deceptive act in trade or commerce and an unfair method of competition for the purpose

6    of applying the consumer protection act…"  RCW 19.190.060(2).  There is (except for the

7    amendment to RCW 19.190.040) no mention of a measure of damages, liquidated or otherwise,

8    and no provision for a direct CEMA cause of action.

9    The saga continues: In 2005, the legislature added an additional prohibition against the

10   practice of "phishing" (inducing someone to reveal personal identification information under

11   false pretenses; RCW 19.190.080) and then added an additional section entitled "Civil actions:"

12   A person who is injured under this chapter may bring a civil action in the superior
     court to enjoin further violations, and to seek up to five hundred dollars per violation,

13   or actual damages, whichever is greater.  A person who seeks damages under this
     subsection may only bring an action against a person or entity that directly violates

14   RCW 19.190.080.

15   RCW 19.190.090 (1).

16   Reconciling this provision with either itself or with the preceding legislation requires

17   considerable statutory construction.  On the one hand, the new provision says that anyone "who

18   is injured *under this chapter* may bring a civil action in the superior court to enjoin further

19   violations, and to seek up to five hundred dollars per violation, or actual damages, whichever is

20   greater."  That sentence, standing alone, seems to say that a direct civil action has been created

21   for any violation of this chapter (which includes emails and text messages), and that the plaintiff

22   may seek injunctive relief or damages.

23

24

ORDER ON MOTION TO DISMISS- 7

1    But then, in the next sentence, the statute says that "[a] person who seeks damages under

2    this subsection may only bring an action against a person or entity that directly violates RCW

3    19.190.080 (*i.e., the phishing statute*)." So now a plaintiff *cannot* "bring a civil action in the

4    superior court… to seek up to five hundred dollars per violation, or actual damages, whichever is

5    greater" if injured under this <u>chapter</u>, but only if the plaintiff is the victim of a phishing scam

6    under RCW 19.190.080.   To call this statutory scheme "unclear" is an understatement.

7    The Court adopts the analysis of the Honorable Robert S. Lasnik of this district to

8    reconcile this confusing piece of litigation.  In an order issued in another <u>Gragg v. Orange Cab</u>

9    <u>Company, Inc.</u> order (2015 WL 6876069; WAWD, Nov. 9, 2015; "<u>Gragg</u> III"), Judge Lasnik

10   ruled that the 2005 amendment created a claim for injunctive relief for any violation of CEMA,

11   but limited a direct cause of action for damages under the statute to phishing violations. (<u>Id.</u> at

12   *5.)

13   Nevertheless, Plaintiff has satisfactorily alleged a potential CEMA violation.  Unlike the

14   TCPA, it makes no difference if some other party "initiated" the text message to Plaintiff by

15   going through the invitational process.  CEMA prohibits "initiat[ing] or *assist*[ing] in the

16   transmission of an electronic commercial text message to a telephone number assigned to a

17   Washington resident for cellular telephone."  Plaintiff's allegations establish a chain of events

18   wherein Defendant "assisted" with the transmission of the invitational text and, adopting Judge

19   Lasnik's interpretation of the statute, Plaintiff thereby possesses a possible injunctive cause of

20   action under CEMA.  All that remains to be decided regarding the CEMA claim is whether the

21   invitational text message was "commercial."

22   Lyft argues Wright's CEMA claim fails because the text message sent by Lyft is not a

23   "commercial electronic text message."  (Dkt. No. 18 at 14.)  CEMA defines "commercial

24

1    electronic text message" as "an electronic text message <u>sent to promote real property, goods, or</u>

2    <u>services for sale or lease.</u>"  RCW 19.190.010 (emphasis added).  The SAC alleges that Wright

3    received a text message that stated "Jo Ann C. sent you a free Lyft ride worth $25.  Claim it at

4    http://lyft.com/getapp/MD15M215."  (SAC at ¶ 23.)

5           Defendant contends that, because the $25 ride credit and the Lyft app itself are free, the

6    text message does not "promote real property, goods, or services for sale or lease."  It is too

7    narrow a reading of the statute and the intent behind the prohibition.  Again, the Court concurs

8    with Judge Lasnik's analysis of a similar invitational offer in another <u>Gragg order</u>:

9           While the Taxi Magic app itself was… offered at no cost, the only purpose of the offer
            was to promote or encourage the use of defendants' taxi services… In addition,
10          prohibiting unsolicited text messages that purport to offer a "free" download or link
            designed to result in future purchases comports with the legislative findings and intent in
11          enacting CEMA.

12   <u>Gragg</u> II, 2013 WL 195466 at ** 4-5, *citing* 2003 Wn. Legis Serv. 137 §1.  As the Ninth Circuit

13   observed in <u>Chesbro v. Best Buy Stores, L.P.</u>, 705 F.3d 913, 918 (9th Cir. 2012): "Neither the

14   statute nor the regulations require an explicit mention of a good, product, or service where the

15   implication is clear from the context."

16          Defendant seeks shelter in this Court's opinion in <u>Hickey v. Voxernet</u> (887 F.Supp.2d

17   1125, 1132 (WAWD, 2012)) based on the finding that an invitation to download a free mobile

18   phone application did not meet the statutory definition of "commercial."  But <u>Hickey</u> is

19   distinguishable – not only was the mobile phone app free, but Voxer (a software application that

20   transformed the user's cell phone into a walkie-talkie) itself was free; i.e., there was no <u>sale</u> of a

21   product or services to promote.  The same is not true of Lyft, which was clearly intending that

22   recipients would use their free app to access their for-profit services.

23

24

1    Defendant's communication to Plaintiff was a "commercial text message" within the

2    meaning of CEMA and a cause of action for injunctive relief is sufficiently stated in Plaintiff's

3    SAC.

4    <u>Consumer Protection Act</u>

5    Defendant is not contesting that its text message satisfies the first three <u>Hangman Ridge</u>

6    elements of a valid CPA claim – that is one aspect of the CEMA statutory scheme that remains

7    clear.  The parties disagree over whether the fourth and fifth elements (injury and causation) are

8    adequately plead by either (1) Plaintiff's alleged injuries or (2) the liquidated damages permitted

9    by CEMA.

10   The Court agrees with Defendant that several of Plaintiff's alleged injuries – e.g., his

11   aggravation and annoyance,  and the "invasion of his privacy" (SAC at ¶ 32) – are, at best,

12   personal injuries and not the "injury to business or property" that the CPA requires.

13   However, Plaintiff also makes claims which, however miniscule, sound in "injury to

14   property" – namely, "having to pay a cellular service provider to receive the unsolicited text

15   message from Defendant," losing the "full capacity" of his phone and the wear and tear on his

16   battery.  (<u>Id.</u>)  Defendant first argues these allegations are not supported by facts but (again) this

17   is a 12(b)(6) motion and Plaintiff is not vulnerable to such an argument at this stage.

18   Defendant also asserts that such an "infinitesimal, fleeting loss" is not cognizable as an

19   injury to business or property under the CPA.  But the WA Supreme Court recently held that "the

20   business and property injuries compensable under the CPA are relatively expansive" and that,

21   "[b]ecause the CPA addresses 'injuries' rather than 'damages,' quantifiable monetary loss is not

22   required."  Therefore, "[t]he injury element can be met even where the injury alleged is both

23   minimal and temporary." <u>Frias v. Asset Foreclosure Svcs., Inc.</u>, 181 Wn.2d 412, 431 (2014).

24

1    Plaintiff makes one sweeping claim of injury, that

2    [t]he transmission of so many unsolicited text messages burdened or injured the
     telecommunications infrastructure through which all text messages must pass.  As a
3    consequence, cellular service providers incurred avoidable costs which negatively impact
     the price that consumers like Plaintiffs must pay for cellular telephone services.
4
     SAC at ¶ 26.  While Plaintiff might run into proof problems with injury claims such as these, that
5
     is an argument for another day.  These claims are not implausible and the Court finds they are
6
     injuries to property (i.e., Plaintiff's financial resources) cognizable under the CPA.
7
              It is important to view these injury claims through the lens of the legislative intent behind
8
     both the CPA and (particularly) CEMA.  With CEMA, the legislature took the relatively unusual
9
     step of statutorily declaring that unsolicited commercial text messages are an unfair and
10
     deceptive practice and a matter of public interest.  That intent informs the Court's analysis of
11
     whether even a relatively minor injury like loss of storage space on a cell phone can qualify a
12
     plaintiff to sue under the CPA.
13
              There is another way to analyze whether a CEMA cause of action constitutes a *per se*
14
     violation of the CPA.  In <u>Gragg</u>, Judge Lasnik ultimately found that none of the injuries listed
15
     above (which the Plaintiff in <u>Gragg</u> also claimed) created cognizable injuries under the CPA.
16
     What the court found, however, was a legislative intent, expressed in the original version of
17
     CEMA, that violations of that statute (which at that time was solely concerned with emails)
18
     constitute *per se* violations of <u>all five</u> elements of a CPA cause of action.  *See* RCW
19
     19.190.030(1).  In amending the statute to add text messages, the legislature made no comparable
20
     statement regarding that form of communication.  "However, there is also no indication that the
21
     legislature intended to regulate the two forms of communication differently."  (There is certainly
22
     no obvious basis on which to differentiate them.) On that basis, the court in <u>Gragg</u> ruled that "the
23
     only way to give effect to the legislature's stated intent is to construe the liquidated damages
24

1    provision [of CEMA's language regarding text messages] as establishing the injury and

2    causation elements of a CPA claim." Gragg III, 2015 WL 6870609 at **5-6.

3         Defendant understandably disagrees and labels this as an unnecessary exercise in

4    statutory construction for a statute whose language is plain.  The Court finds the meaning of the

5    statute to be anything but clear; attempting to discern and effectuate the intent of the legislature

6    is essential under such circumstances.   That exercise yields a finding that Plaintiff has

7    adequately stated a claim under Washington's CPA and should be allowed to proceed.

8    Order to show cause

9         With the dismissal of Plaintiff's federal claim, the Court is left with the discretionary

10   decision of whether to retain supplemental jurisdiction over Plaintiff's remaining state claims.

11   28 U.S.C § 1367(c)(3); Brady v. Brown, 51 F.3d 810, 816 (9th Cir. 1995).  The parties are

12   ordered to show cause why the state law claims should not be remanded to state court; the

13   briefing must be filed within 14 days of the filing of this order and shall not exceed twelve (12)

14   pages in length.

15                              **Conclusion**

16        Plaintiff has failed to state a claim for relief under the TCPA because "invitational"

17   messages sent at the behest of existing users of an app or system do not fall within the ambit of

18   the statute.  The Court finds that amendment of the claim would be futile, and on that basis the

19   dismissal will be with prejudice.

20        Plaintiff's complaint succeeds in stating a claim for relief under the Washington state

21   statutes known as the Commercial Electronic Mail Act and Consumer Protection Act.  The

22   parties are ordered to show cause why the Court should not decline to exercise supplemental

23   jurisdiction over those causes of actions and instead remand them to state court for resolution.

24

1

2

3       The clerk is ordered to provide copies of this order to all counsel.

4       Dated April 15, 2016.

5

6

7
        _____
        Marsha J. Pechman
8       United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24